# George B. Neal, Appellant, *v.* Wm. H. Black and Thomas H. Lane.

177  83
193  611

*Deed—Voluntary deed of settlement—Revocation.*

Where a person executes a voluntary deed of trust of his property for his own benefit, he thereby constitutes himself a ward of the court, and though no vested right in another be granted, he cannot revoke his act; except subject to the approval of a court having jurisdiction of such subjects.

The absence of a power of revocation in a voluntary deed of trust does not render the deed improvident, if such power would defeat the purpose for which the deed was given, and it appears that a clause making it irrevocable was inserted at the request of the grantor.

*Deed—Voluntary deed of settlement—Trust and trustees—Discretion of trustee.*

A provision in a voluntary deed of trust leaving to the discretion of the trustee the amount of income to be paid to the grantor, will not defeat the deed, if it appears that the income from the estate was large, and that the provision was inserted after full discussion, and practically at the grantor's suggestion.

It is not improper in a voluntary deed of trust to give to the trustee extensive powers, and to give him unlimited discretion as to the conversion of property and investments.

*Voluntary deed of trust—Security by trustee.*

A voluntary deed of trust is not invalid because the trustee is not required by the deed to give security.

*Voluntary deed of trust—Trusts and trustees—Account—Power of court.*

As the legislature has conferred upon the courts extensive powers over trusts and trustees, it is not necessary in a voluntary deed of trust to provide that the trustee shall account to the cestui que trust.

*Voluntary donation—Burden of proof.*

Whenever one person obtains by voluntary donation a large pecuniary benefit from another, the burden of proving that the transaction is righteous falls upon the person taking the benefit; but this proof is sufficient if it shows that the donor knew and understood what it was that he was doing.

*Equity—Deed—Voluntary deed of trust—Power of appointment—Grantor's mental capacity—Independent advice—Revocation—Evidence.*

A young man about a month after he became of age executed a voluntary deed of trust to his uncle, who shortly afterwards under a power conferred in the deed, transferred the trust to the grantor's former guardian, a man of high business standing and integrity. The grantor while able

to understand an ordinary proposition was of weak intellectual powers, and his mind had not been fully developed. No witness in the case stated unqualifiedly that he was able to take charge of and safely manage his affairs. The deed was prepared under the advice of the family physician who had knowledge of the grantor's mental condition when he came of age. The deed was presented to the grantor together with a statement of the amount of his property, which he professed to understand. He stated that he desired his guardian to be the trustee, but acquiesced in the temporary appointment of his uncle until his guardian should file an account and be discharged. The uncle consulted with the attorney of the guardian, and when the deed was prepared the grantor visited the attorney, who carefully explained the deed, and after discussion with the grantor, a clause was inserted at the grantor's suggestion giving to the trustee discretion as to how much of the income should be paid to the grantor, and also a clause making the deed irrevocable. The guardian had no knowledge of the deed until after its execution. The estate amounted to about $165,000, and the compensation of the trustee was fixed by the deed at $500 per year. About five years after the execution of the deed the grantor at the suggestion of his wife's uncle executed a deed of revocation, and subsequently filed a bill in equity to enforce the revocation. The evidence did not show that there had been any marked improvement in the grantor's mental powers or business capacity after the date of the execution of the deed. *Held*, that the deed of trust should not be revoked, and that the bill should be dismissed.

Argued Jan. 30, 1896. Appeal, No. 243, Oct. T., 1895, by plaintiff, from decree of C. P. No. 1, Allegheny Co., June T., 1894, No. 179, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ. Affirmed.

Bill in equity to enforce the revocation of a voluntary deed of trust. Before SLAGLE, J.

The facts appear by the following opinion of the court below :

The bill in this case was filed for the purpose of enforcing a revocation of a voluntary deed of trust made by plaintiff to William H. Black, who, under authority contained in the deed, subsequently appointed Thomas H. Lane as trustee in his stead, who is still acting as trustee. The bill sets forth that plaintiff is the son of James Lawrence Neal and Margaret Neal, both of whom died when he was a child of tender years. That his mother was a daughter of George Black, from whom he inherited a large estate. That Thomas H. Lane was appointed

his guardian and acted as such until plaintiff came of age on the 26th day of September, 1889. That on the 19th day of October, 1889, plaintiff executed a paper by which he conveyed to William H. Black all his estate in trust, and subsequently, on December 20, 1889, the said Black appointed Thomas H. Lane as trustee in his stead.

The deed is an absolute conveyance of all plaintiff's property to William H. Black, his heirs and assigns, and gives to him the absolute and unqualified power to take charge of the same, to sell at public or private sale, to invest and reinvest, etc., at the will of the trustee, and to appoint a trustee in his stead.

It is further provided that, " Out of the net income of said trust estate, which shall not be subject to my control or engagements, to pay from time to time such sums as he, said trustee, shall deem proper for the liberal and comfortable support and maintenance of myself and any family and establishment I may acquire or have, or should support, for which sums my receipts shall be vouchers; to reinvest and accumulate the remainder, if any, of such net income during my life, and at my death to convey and assign the whole of said estate, with all its accumulations, as I by my last will or writing, in the nature of such last will may direct and appoint, and in default of such will or testamentary writing, to such persons as would inherit my estate under the intestate laws of the State of Pennsylvania in such shares and interests as by such law directed."

The trustee is authorized to retain $500 annually out of the income as compensation. The conveyance is made irrevocable.

The bill further alleges as follows :

" 5. Your orator further avers that at the time of executing said paper, exhibit ' A,' and for a long time prior thereto, he lived at the house of his grandmother, Mrs. Jane Black, and said paper was prepared at the instance of William H. Black, who is his uncle, and who lived at the same home of said Mrs. Jane B. Black, until a few months before the preparation of said paper, and continued to visit at said home frequently. Your orator. had no knowledge in relation to said paper or the contents thereof until the same was presented to him by said William H. Black for signature on October 19, 1889; that he executed said paper solely at the solicitation and upon the advice of said William H. Black, and at the time he was entirely

inexperienced in business, unacquainted with the extent and value of his estate or its conditions, the information in relation thereto being in possession of said Lane and Black, and they having concealed the same from him, and, in executing said paper, he acted on the suggestion and advice of said Black without any independent advice and under an entire misapprehension as to the terms and legal effect thereof.

" 6. That said William H. Black and Thomas H. Lane, although requested, have neglected and refused to render an account of said trust.

" 7. That on February 22, 1894, he executed a revocation of said trust," etc.

The defendants in their answer admit all the allegations of the bill except those contained in the fifth paragraph, which they deny, and set forth at length the circumstances under which the deed of October 19, 1889, was made, and allege that it was made with full information as to his estate and knowledge of its purposes, and that he was satisfied with it until after he was secretly married in September, 1893. That they refused to give a statement of his property because they believed that persons other than plaintiff were endeavoring to obtain control of his property. They deny that the revocation was of any effect because the deed is in terms irrevocable, and to revoke the same would work great injury to the plaintiff.

It will be observed that it is not disputed that George B. Neal, at the time of the execution of the deed in question, was competent to make a contract. The plaintiff does not allege that he was incompetent, and in fact claims that he is now fully capable of managing his own affairs, and does not show such marked improvement in his condition as to justify an allegation that he was not then legally competent. Of course the plaintiff's case depends upon his capacity at that time to make a valid contract. There is no evidence in the case to show want of legal capacity at that time.

Plaintiff's bill is based upon circumstances attending the execution of the paper, and the character of the instrument itself. Though no request was make by plaintiff for specific findings of fact or of law, the grounds of the application are very clearly set out in the exhaustive and able argument presented by counsel in propositions as follows :

" 1. There being no power of revocation in this deed, and it having been prepared and the signature thereto procured by persons who stood in a confidential relation to Neal, the burden of proof rests on defendants.

" 2. This burden can only be met by clear and decisive proof.

" 3. This burden is upon defendants to show by such clear and decisive proof these things : (*a*) that Neal had a true and full knowledge of his estate, its extent and value, and of the income therefrom ; (*b*) that he had independent advice in regard to the act which he was performing ; (*c*) that the terms and provisions of the deed were proper and reasonable ; (*d*) that he had a full, clear and intelligent understanding of the act he was engaged in and of the effect and consequences of the deed which he was executing."

The defense is, that Neal was informed of the amount and character of his estate ; that the control of his estate was put into the hands of a trustee at his own request, and he was fully informed as to the contents and purposes of the deed, and it was made irrevocable at his request ; and further, that though then and now competent to make a valid contract, he is of weak intellect,—without qualifications for the transaction of business and incapable of acquiring such qualifications as would make it safe to intrust him with control of his estate.

The main question in dispute is as to the mental capacity and business ability of George B. Neal, and should be first considered, as it has a bearing upon the other questions of fact and law.

The testimony of George B. Neal, and his manner upon the stand, would indicate that he is not a man of full mental vigor or average intelligence, though his testimony was to some extent affected by his defective hearing.

He could not tell when his father, mother and grandfather died. These events happened before he knew anything ; but an ordinary person would have inquired and remembered such important matters. He says he did not know he had a guardian or had any property until about two weeks before he came of age. There are not many young men of that age, with a fortune of $100,000, who would have been ignorant of that fact or who would not have inquired as to the matter. When he undertook to give the amount of moneys paid to him

by Mr. Lane in 1893 he became thoroughly confused and could give no intelligible answer.

Dr. Willard was his attending physician from infancy until he was sixteen or seventeen years old. He testified that in infancy George was affected by marasmus, and his development was very slow. He advised his grandmother that he did not think it was proper for him to arrive at the age of twenty-one, unless some disposition was made of his affairs or some one was appointed to look after him. He also was of the opinion that the best thing that could have been done to develop his mental condition was to keep him at home under a tutor or governess; that there was no use sending him to school because he could not take an education.

Dr. Fleming had attended him at times for four or five years. He says : " He had no capacity for understanding what I was talking about; in mental condition he was a child simply—his mental development was incomplete. He could read and had a personal identity; he was neat and cleanly in his person, that showed that his moral condition was good, but the intelligence was defective and his judgment faulty." He gave it as his opinion that Neal did not have mental capacity for dealing with a considerable estate.

Miss Benson was employed as teacher for eleven years and remained with him until his marriage in 1893. She traveled with him extensively,—to Chicago, Denver, and a long trip in Europe. She says: " His mental development was weak; his memory was very good, but he hadn't any reasoning power whatever, and is of a dependent nature—is easily persuaded or influenced by others, expecially by any one to whom he may take a fancy. He was not capable of taking care of his property or of himself, either."

M. L. Durst was employed as teacher about 1883. He says : " Well, George couldn't learn a rule so that he could use it three or four days later. He could go through the examples or exercises under the rules; he could learn to go through those exercises, and to me it seemed very well, and I thought he was learning those rules so he could retain them, and for two months I supposed he was making very good progress, but at that time I began to make some reviews with him and had occasion to use the rules that he had been drilled in and found that he couldn't

use them. At end of year do not think any progress was made. He was very well in history,—seemed rather broad and well-informed in many things ; was fairly good in geography, was fairly good in spelling and was fairly good in writing."

Samuel Rea, an uncle by marriage, knew George from childhood : saw him frequently at Mrs. Black's and at his own home ; took George to Europe in 1892. He says of him: "He was very backward as a boy and seemed incapable of taking an education, such as the average boy is able to take. He has a good disposition, exceedingly kind-hearted, very easily influenced by those whom he cares for, but is totally unable to do any business. In my judgment he is totally unfit to take care of his estate. If a thing is explained to him he seems to understand it thoroughly, but it is liable to get away from him."

These witnesses have no connection with this case. William H. Black, Thomas H. Lane and W. A. Lewis express similar opinions.

On part of plaintiff a number of witnesses were called to testify to the capacity and ability of George Neal.

Rev. Dr. Fulton had known him for some time. During last summer and the previous summer had correspondence with him ; and in January of 1894 taught him for twenty or twenty-five days. He details the course of study and says that he made a very marked improvement, and adds : " With the right kind of education I am satisfied that he would continue to improve ; and while I make that statement there are several things to be taken into consideration." He was asked this question : " Assuming that this young man's estate, as it exists at present, to be invested in securities,—Pennsylvania Railroad stock, and the remainder in school, city and county bonds, etc.,—I wish you would state what your judgment is as to his ability to take care of that property invested in that way." To which he answered: "I think he could do it." On cross-examination he said that he had not tested George as to his studies after the lessons ceased. That he did not think George had an ordinarily developed mind, and explained: "In the first place George is one of those men in whom the sutures of the brain become hardened early. In the second place, I think his education has not been sufficient or of the kind to develop the mind of any boy." He further said : "I think he could transact ordinary business.'

He was asked the question : " Suppose he was given his estate to-day of $200,000, invested in stocks and bonds, do you think he could be trusted to convey that property and reinvest it safely ? " To which he answered: " No, I don't. I think he can manage that as at present invested. . . . He could take care of it with such advice from counsel or business men that he could secure, but I don't think without that he could manage any business complications."

R. G. Gamble, an uncle of Neal's wife. He knew George about eight years. In answer to the same question put to Dr. Fulton, says : " Well, I believe George could take care of money, and I believe he knows when he sees a good investment. I think in time George could be educated, with a little assistance, to manage it himself. Of course, it is very hard for a man that has never had any experience in business of any kind to manage or transact business,—buy or sell safely." He was asked : " Q. Do you think George could be safely trusted to invest $15,000 to $20,000 ? A. I don't know about that; that would be hard to tell. Q. You don't think he could at present ? A. Not without assistance ; and I don't think any person could." He advised George to revoke the deed of trust, and gives a statement of the circumstances : " I told him it would have to be fixed in some shape,—either he would have to take care of it himself or have it fixed so he couldn't lose it, and nobody could beat him out of it."

William B. Neal, an uncle, says : " I consider that George s very careful and cautious in any undertaking, but owing to his bad education he would not be able to take care of his affairs without further education and advice. Had him in office from the time he was seventeen or eighteen years old until after he came of age."

W. B. Moyle knew him about eight years ; says : " He is very cautious in money matters." In answer to question put to Dr. Fulton, says : " Well invested in first class securities, I suppose, I think, I know he would be capable of taking care of it." And again, " Well, I don't think George would be able, perhaps, to increase it to any great extent, but as invested now he would be able to take care of it."

Reese Neal, an uncle, says : " He visited our house a great deal, and went with us to Michigan once for two weeks ; bought

his own ticket and looked after his own finances. Always considered him very careful."

In answer to the question : " If his estate, consisting as it now does, of Pennsylvania Railroad stock and municipal and state bonds, was put into his possession, do you think he would be able to manage that property ? A. Yes, sir; I think he could." In cross-examination, he said : "By managing, I mean that if he had that estate left to him and if he struck some matter that he didn't understand he would have sense enough to go and see where it was wrong, if he thought it was wrong. . . . I think he is fully developed mentally. I think he is a little slow in some things, but I think that is partly on account of his hearing. He is a little slow in learning. Q. You think it would be safe to give him $200,000 and let him go out and take care of himself ? A. Yes ; because he would take advice where he didn't understand."

Dr. Samuel Ayers, an expert physician, made an examination of Neal for the purpose of testifying in this case. He had ten or twelve interviews with him, says that " he is possessed of a very fair degree of mental capacity, a little under the average in some respects and average in others. In the mathematical faculty he is defective. In some of his faculties, his observa‑ tion for instance, he was very good. . . . His judgment was apparently good in various matters, perhaps defective in some directions. His attention was close and acute, his speech was clear and coherent in all matters ; special senses all normal except hearing ; handwriting particularly good, and composi‑ tion good; expression of face natural and normal ; caution and care normal. . . . As to mathematics he is decidedly under the average, in almost every direction you take him. His reason‑ ing powers are quite good. . . . Has difficulty in making change. . . . I think there has been some defect in his development—this marasmus—probably stopped the organic growth in the brain ; it was an interruption in the early years, undoubtedly, but he seems to have overcome it in later years largely, particularly during his married life. I have no doubt that he has developed in many of his faculties much more readily than before."

Being asked : " Take George in the condition in which you found him and give him the possession and control of, say $50,000, do you think that would be a safe thing to do ? " He

answered, " Well, yes ; I will answer you by yes ; that it would be comparatively safe. Q. Do you think for George's own sake, supposing he was some relation of yours; say he was the only son of some lost sister of yours, would you put him in possession of $200,000 worth of property to handle and dispose of ? A. No, I don't believe I would. Q. Why wouldn't you do it, doctor ? A. Well, I would not do it for this reason: I think probably he could not manage safely such a large sum without he had some experience, and without some assistance, too. He might get along with it, probably, with some losses, but I believe he is capable of profiting by experience of that kind, because he is capable of development. Q. If invested as it is said to be invested now, in Pennsylvania Railroad stock and municipal and county bonds, would he be able to take care of it ? A. I think he would, from what I have seen of him."

Mrs. Neal finds nothing wrong. "It is just the way they kept him."

A fair conclusion from all this testimony is that though George B. Neal, the plaintiff, is able to understand an ordinary proposition when presented, and competent to make a contract, his intellectual powers are by nature weak and have not been fully developed. None of the witnesses for plaintiff state unqualifiedly his ability to take charge of and safely manage his estate. They differ from the witnesses on part of the defendants as to the amount of his mental power and the chances for improvement. They all agree at present that he would require assistance. George himself says that he thinks he is able to take care of his estate, but is not capable of doing business; thinks he has improved a little in the last year or two, and says : " I attribute that to, since my marriage, that I have learned a little more; have got out among people; by getting out more with people, business men especially, but I will learn a great deal more."

The criticism made by plaintiff's witnesses as to the education of Neal does not seem to be well founded. There is no evidence that his grandmother and uncles, with whom he lived, were not anxious to do everything best calculated to develop his powers. Those with whom he passed his daily life would be better able to judge as to what was best than those who met him casually. He was sent to school, provided with teachers,

given very considerable opportunity for travel, and his uncle William B. Neal, says that for several years he was taken into his office with a view of his learning something of business.

Dr. Willard, who attended him from infancy, and Dr. Fleming who attended him when grown, would be able to form a more reliable judgment as to his capacity than a physician called in to make an examination.

The next question of dispute is as to the making of the deed of trust, and the circumstances attending it.

Defendants claim that as the allegations of the bill are denied, they should have been supported by the testimony of two witnesses, and standing on the testimony of Neal alone, all questions thus raised should be resolved against the plaintiff. The plaintiff contends that the relation of the parties casts the burden upon defendants. The testimony having been produced, we think it should be considered and determined upon its weight.

This question may be considered under plaintiff's third proposition, to wit: that it must appear (*a*) that Neal had a true and full knowledge of his estate, its extent and value, and of the income therefrom; (*b*) that he had a full, clear and intelligent understanding of the act he was engaged in, and of the effect and consequences of the deed he was executing; (*c*) that he had independent advice in regard to the act which he was performing. These propositions may be more strongly stated than the law of the case justifies, but they suggest the questions of fact in dispute.

George Neal's account of the transaction is that the deed was signed in his grandmother's house. He says: "I was sitting in the back parlor reading a book, and William Black and grandmother came to the door; I first noticed them standing in the door, and I just glanced up and didn't pay no more attention to them, and my grandmother came into the room and spoke to me and said that, 'Will, would like to see me,' so I laid down my book and went out and followed him across the hall into the sitting room, and he asked me, he would like me to sign this paper, so he held the paper out—the deed of trust—and he read it over to me but didn't explain any of the parts of it. Then he said: 'Do you want to manage this estate yourself or do you want somebody appointed to manage it for you?' Well, I thought over it a minute or two and mentioned Mr. Lane. He

said: 'You would rather have Mr. Lane, repeated?' I said: 'Yes, sir;' and he said: 'Well, sign this.' I signed the paper and he didn't say anything for a while, and I said, '.Will, can I look at the papers?' and he said, 'Certainly,' and I looked over it; just glanced down each page and turned it over, but I couldn't understand anything about it. I never saw such a paper as that before. Then I folded it up again and handed it over to him. He says: 'Do you understand it?' I says, 'Yes;' but I meant that I had appointed Mr. Lane, and that was all there was of it. Then he asked — There is some other part of it I can't quite remember; but he showed me a paper of some kind that he called a statement. He held it in his hand, but I could not tell you what was on it. I only heard only a short time before that Mr. Lane was my guardian. Only after I signed this deed of trust, I asked Will, 'How much am I worth, Will?' And he said, 'Something over $150,000.'" On cross-examination, he said that before this he knew that he had some property, but did not know how much or who had charge of it; that a couple of weeks before he heard an aunt say that Mr. Lane was his guardian. "I didn't think any more of it." He had no recollection of signing any paper in connection with Mr. Lane's account. The only paper he recollected was the deed of trust; says he acknowledged the deed of trust at the office of W. A. Lewis, but says: "He didn't tell me anything about the deed of trust;" and denies that he had any talk with Mr. Lewis as to the terms of the deed, or the account of Mr. Lane. "He read it over to me but that's all. William H. Black read over something but I don't know what was on it."

William H. Black says that Dr. Willard had advised that some arrangement should be made for the care of Neal's estate when he came of age. That when George was about to come of age he obtained a statement showing accurately the condition of George's property up to that time; that he gave the statement to him and asked him whether he thought that he was capable of managing his property. He replied in a very pathetic way that he didn't feel himself competent to take charge. He then expressed a desire that Mr. Lane should continue the management of his property. He professed that he understood the situation, and at his suggestion I undertook to become trustee in the interim until Mr. Lane had filed his account as guardian

and been discharged. I showed it (the statement) to him, particularly the part showing the aggregate of his property. This was the rest of a family consultation." Afterwards saw W. A. Lewis, Esq., and after a number of consultations with him the deed of trust was prepared. Mr. Lewis was not Black's attorney, but had represented George Neal's estate. The deed was signed at Lewis's office; Mr. Lewis went over it with Neal and discussed it with him. The clause making it irrevocable was inserted at Neal's request.

As to his understanding of the statement and deed of trust, he says: "He had mind enough to understand the total amount and different items composing his estate, but would not know the difference between a bond and a promissory note. He understood the terms of the deed of trust, whether he understood the full import I do not know."

W. A. Lewis says he was attorney for Neal's estate and for his guardian. He did not see Neal in reference to this matter until the time of executing the deed, but states at length his conference with William H. Black and his instructions to him; and states the interview when the deed was signed as follows:

" I asked Neal whether he understood what his estate consisted of, and whether or not he wanted me to go over the account of Mr Lane with him and explain it to him. He said no, that his uncle, William H. Black, had gone over it with him and he understood it pretty well, or as well as he hoped to; that he didn't understand figures or money matters very well, and he didn't want to have anything to do with it, he would only get twisted up, and he wanted me to have his uncle appointed trustee first, so that Mr. Lane could file his account; then when Mr. Lane would get through with his account, and it would be passed by the court, then Mr. Black would appoint Mr. Lane trustee in his stead. I then asked him whether or not he wanted this deed of trust to be revocable at any time, and advised him that he ought to state in the deed of trust whether he wanted it revocable or irrevocable; that it might be drawn to be revocable after ten years or after he would become fifty, if he thought he would improve; but he said he didn't expect to, that he had been training with teachers and traveling, and the only thing he could learn was a little history, and for me to put in a clause so that it couldn't be coaxed away

at any time; that is the word he used. Then I added the clause in his presence in the office. I wrote these words: 'And I hereby make this conveyance irrevocable.' This deed of trust was not out of my office after it was written, until Mr. Neal had been there and talked it over with me and executed it. I read it over and explained it to him. I think we were pretty near all the afternoon over it—an hour or an hour and a half anyway. There was nothing in this paper he did not understand. He was brought to my office for that purpose. Otherwise I could have sent this paper to be signed by him at his grandmother's. It was explained in all its details, and I thought he well understood it. He afterwards joined with his uncles in having Mr. Lane discharged. That is the paper they sent to grandmother Black's home."

He says the clause in relation to income was inserted after the paper had been drawn and after discussion with Neal, which he details.

" As the paper was originally drawn, I think it was to draw all the income if he wanted it. And he thought that was giving him too much range and it might not be best to have it in that shape."

Samuel Rea says : " I remember one occasion, we were at the Savoy Hotel, I think, in London. He detailed to me the transfer of his estate and how well satisfied he was that Mr. Lane or his uncles should have charge of it; that he didn't feel that he could take care of it or understand it."

Miss Benson says : "About the time he was twenty-one he came to me and told me that they had told him all about his affairs and asked him if he wanted to take charge of his money or have some one else do it, and he said, O no, he wanted somebody else to do it, and they asked him who, and he said Mr. Lane and his uncle Will. Then it seems that he had some papers at home that he wanted to bring up to me to read ; he read them over he said and could tell me where his money was and how it was arranged ; what railroad stock he had and different things about it. He tried to explain to me, but I can't tell you anything he said because I didn't care. I remember he spoke about railroad stocks. I think he told me the amount of the whole ; it was something over $150,000."

In view of this testimony there is no room to doubt that the

plaintiff was fully and fairly informed of the condition of his estate and the terms and conditions of the deed of trust. Whether he fully comprehended them in all the details is not so certain. He was able to understand in a general way the condition of his estate—the purpose to be accomplished and the mode of effecting it. This is all that should be required. If it were necessary that a person creating such a trust should fully appreciate all the technical intricacies of the transaction he would not need a trustee, and one who did would not be able to protect himself against his own weakness and incapacity. It is sufficient that he be not deceived, or misled by fear or favor.

In this case there is no allegation of any attempt to deceive Neal or mislead him in any way, except such as may be implied from the statement that he was ignorant of the condition of his estate. " The information in relation thereto being in the possession of said Lane and said Black, and they having concealed the same from him."

This statement is not fully sustained even by Neal's own testimony. He admits that Black told him that his estate amounted to over $150,000, and showed him a statement of it, which he read to him. He is not sustained by any other witness. Black says he obtained a statement from Mr. Lane which he showed to Neal and explained to him. Lewis says he offered to go over the accounts of Lane with Neal and explain them to him but he said that it was not necessary as his uncle William had done so. And he told Miss Benson that he understood all about his estate, and offered to show of what it consisted.

We are therefore of the opinion that there is no reason for setting aside this deed because of ignorance or concealment.

But it is claimed that Neal did not have proper counsel and advice, and that the deed should be revoked, if for no other reason, because Neal acted " without any independent advice."

Some of the cases say that this of itself is sufficient ground for setting aside a voluntary deed. What is independent advice? We think an examination of the cases will show that the word is used as a synonym of " impartial." One of the definitions of the word is " Not subject to bias or influence." It certainly does not mean that when a person has the advice of one or more impartial friends he must seek or the friend must suggest appli-

cation to another.   Nor do we think, when the friend is a near relative who is familiar with the condition of the party as to mental capacity and estate, that it is necessary to call in a stranger to make his advice valid.

Neal says he acted solely on the advice of William H. Black. If so, why was he not an independent and competent adviser? It is true that he was made trustee with an annual salary of $500.   But this was a temporary arrangement, to continue until Mr. Lane, the selected trustee, could be properly appointed. Otherwise Black had no personal interest in the deed.   All the estate was left to the absolute, final control of Neal.   The only interest he could have in the estate would be in case of intestacy.   But this he had under the law and not through the deed.   He did not act solely upon his own judgment, but upon the advice of Dr. Willard and after consultation with other members of the family.   In seeking legal advice he did not go to his own attorney, but to Mr. Lewis, who had acted for Neal in appointment of his guardian, and says that he represented Neal's estate, though he acted as attorney for his guardian. Mr. Lane says he knew nothing of the deed until after it was executed.

When a young man, soon after coming of age, makes a voluntary deed giving away his estate, or relinquishing a right in favor of another, and especially if he be of weak mind and inexperienced, the transaction should be carefully considered in view of all the circumstances.

But in this case we find no evidence that Black and Lewis did not act fairly and honestly for what they regarded the best interest of Neal, and we do not think there was anything in their relations to him or his estate to make them incompetent advisers.

But it is further claimed that the deed is improvident and the revocation should therefore be sustained.

When a deed is voluntarily executed by a person, it is doubtful whether he can revoke it merely because it is improvident. But as in this case the deed confers no vested right in any third person, but is solely for the protection of the grantor, a court should inquire whether the provisions are inconsistent with such purpose.

Under the circumstances of this case we regard the general

purpose of the deed as eminently wise and proper.   Neal was a young man possessed of a large estate.   He was of weak intellect, but with sufficient ability to recognize his incapacity. He was inexperienced in business, and whether it was because of improper education, as alleged by his witness, or inability to take a proper education, as said by those more intimately associated with him, the fact remained, and even he himself did not expect improvement.   It was certainly wise in him to put it into the hands of some one able and willing to take care of it, and upon terms which would prevent waste by mismanagement and so that it might not be "coaxed" from him.   The trustee selected was a well known business man of unquestioned integrity, a friend of his grandfather, who had shown his ability by increasing his estate while guardian, from about $97,000 to about $165,000.   Unless something in the special provisions is found to be unreasonable, the deed could not be held to be improvident.   We will, therefore, examine the matters suggested by counsel in their order as stated :

1. "It strips Neal of all his property without any valid reason therefor."   This is not in accordance with the fact.   The deed does not give away any part of his estate, except $500 a year as compensation to the trustee for management.   It does give to the trustee the power to control it, for the very good reason that he did not feel able to safely manage it himself.

2. "It contains no power of revocation."   This is a fact; but it does not of itself render the deed improvident.   It was inserted upon full consideration and at his request, as stated by Mr. Lewis.   To have made the deed revocable would have defeated the purpose for which it was made.

3. "Because it leaves him at the discretion of the trustee as to what portion of the income he shall receive from his own property."   This provision was made after full discussion, and practically at Neal's suggestion.   The income was large and he felt that it might be wasted and preferred that it, like the rest of his estate, should be protected by the judgment of his trustee.   No difficulty has so far arisen.   Neal has had all he asked and presumably all he needed.   If the trustee should unreasonably withhold the income, he is under control of the court and may be compelled to do his duty.

4. "Because it makes no provision for future contingencies

or emergencies." The income of the estate was probably deemed sufficient to provide for all contingencies. It is ample for the liberal support of a family and the accumulations would probably be sufficient to meet any unusual demands. If not, the entire estate is within the control of the court.

5. " Because it gives unsafe and unwise power to the trustee." If a man retains control of his property he has unlimited power over it. If he deems it wise to commit it to another, a proper management of it requires that he should confer extensive powers.

The specifications under this head are:

(*a*) " That the trustee is not required to give security." We think an examination of the case will show that it is an exceptional case where a trustee created by a voluntary deed is required to give security. There is no reason why he should be when he is selected by the grantor and he alone is interested in the estate. Presumably he is selected because of his ability and integrity and for the convenience of the grantor, and it would be unreasonable for the grantor to ask a third person to stand good for the default of his own agent. See Rigler v. Cloud, 14 Pa. 364.

(*b*) The objection that " William H. Black has the power to name a new trustee without security " has more force. But this alone ought not to strike down the deed. It may seem unwise to give the power to name a new trustee to Black. Neal doubtless thought that if the occasion arose Black would act only for his (Neal's) good, and that his acquaintance with the business world would enable him to make a better selection. He would not be likely to act without consultation with Neal, and if he undertook improperly to act contrary to Neal's wishes, he could be restrained.

(*c*) " The trustee has unlimited power as to conversion of property and investments." We do not think it an unwise thing to authorize the trustee to make investments outside of those expressly designated by law. So far the investments of the trustee are largely those made by Mr. Black, from whom the estate came. But, as before remarked, a wide discretion must be confided in a trustee in such a case.

(*d*) " The trustee is not required to account to anybody." Neal can require an account at any time, and, if refused, the

trustee can be compelled to make it. It is alleged that an account has been frequently demanded and refused. It was demanded several times within a few days, about the time the bill was filed in this case. Lane told Neal that he would make it out, but that it would require some time. Lewis offered to go with him and go over the books. A statement was made and handed to Mr. Black, who concluded that at that time it ought not to be furnished.

The legislature has conferred upon the courts very extensive powers over trustees and trust estates. It is therefore unnecessary to reserve in the deed creating such a trust rights to the cestui que trust which he may exercise under the supervision of the court: And it would be unwise and improvident to do so when the trust is created to protect him against his own weakness.

The foregoing has been written in consideration of the facts of the case, and though some of the principles of law, as we understand them, have been stated, we have not referred to the case by which we believe they are established. Those will now be considered.

At the first blush it would seem that one who was compos mentis and sui juris, who has made a voluntary deed for his own benefit, and by it granted no vested right to another, should have the power to control his own affairs and revoke the trust whenever he felt disposed to do so. This does not appear to be the law. When such a trust is created the party constitutes himself a ward of the court and cannot revoke his act except subject to the approval of a court having jurisdiction of such subjects. This is apparent from the many cases in which the courts have been asked to ratify such revocations and the many cases in which they have refused to do so.

Among the first cases upon this subject in Pennsylvania is Reese v. Ruth, 13 S. & R. 434. The deed was substantially in the terms of the deed in this case. It was an action of assumpsit brought before the extensive equity powers now conferred upon our courts by the act of 1836. The court held that the action would lie, but that the jury should have been instructed "that the plaintiff had no right to avoid her deed unless fraudulently obtained, and they might at the same time have directed

them that she was entitled to what was necessary for present maintenance under the restriction which I have mentioned."

One of the cases upon the subject : Reidy v. Small, 154 Pa. 505, is almost identical with the present case, except as to the age of the parties,—Reidy being seventy-three years old and Neal twenty-one. Justice DEAN, in reversing the decree of the court below, says : "We think the execution of this deed, under all circumstances, was a wise act on part of the plaintiff. Both he and the trustees have access to the court who will see to it that the trust is faithfully executed. There is no reason why it should be revoked, while there are many why it should be sustained." The facts of that case and the reasoning from them, as stated by Justice DEAN, would aptly apply to this case by substituting "natural incapacity," for "drunkenness and fear of insanity." It meets nearly every question raised in this case. He very clearly shows that the fact that the deeds contained no clause of revocation did not affect its validity, because such a clause would have defeated the object of the trust. See to same effect Ashhurst's Appeal, 77 Pa. 464, and Ash's Appeal, 80 Pa. 500.

The other reported cases differ from this in the fact that the deeds in dispute gave vested or contingent rights to third parties, but they seem to have been disposed of upon the same principles as the cases cited. In Greenfield's Estate, 14 Pa. 489, the case seems to have been ruled largely upon Reese v. Ruth, supra. The court says : "Settlements like that before us, reserving a present interest in the creator of them and carrying a future benefit or bounty to other designated parties, are very usual. If fairly made and carried into effect, uninfluenced by fraud or circumvention, they cannot be subsequently impeached, as is shown among other determinations by our own case of Reese v. Ruth, 13 S. & R. 434." And Judge GIBSON refers to the fact that one of her purposes was to protect herself against the importunities of some of her friends : page 495.

In Nace v. Boyer, 30 Pa. 99, it was said that, "nothing but fraud or palpable mistake is ground for rescinding an executed contract. . . . But the mere fact that a person is of weak understanding, whether produced by old age, accident or disease, if there be no fraud or surprise, is not an adequate cause of

relief. . . . and the mere fact that a contract is improvident is no ground for setting it aside." Page 110.

"Advice or even persuasion to make a deed or bill in a particular way is not fraudulent. There must be something more, something which amounts to imposition or circumvention." Page 113. The opinion of Judge Symser considers all these questions very fully and clearly. In this case the court refused to revoke the deed though it was subsequently declared to be testamentary and, therefore, revocable: Frederick's Appeal, 52 Pa. 338.

In Ritter's Appeal, 59 Pa. 9, Ritter being addicted to drink, made a deed of real estate, in trust to pay debts, $60.00 per annum to Ritter and balance to his wife. The court says: "This deed is neither testamentary nor revocable, and it is clearly the interest of all parties that it should be sustained. It was made by the plaintiff with full knowledge of his own weakness, and we cannot doubt he was the best judge of himself." Page 13.

In Fellow's Appeal, 93 Pa. 470, it was said: "The title of a trustee under a deed of trust is complete and irrevocable by the settlor, although the transaction be purely voluntary."

Merriman v. Munson, 134 Pa. 114, was a spendthrift trust. The court below said: "The proof by these witnesses, as against the plaintiff's own testimony alone, shows that the power of revocation was purposely and knowingly surrendered by the plaintiff in order to guard against his own inability to control and administer his property." Page 127. And the Supreme Court says: "To have inserted a clause of revocation in such a trust would have been an act of extreme folly as it would have rendered it of no value for the protection of his estate." Page 131. See, also, Simon v. Simon, 163 Pa. 292.

None of the cases in which such deeds have been declared void will be found to be inconsistent with the principles upon which the foregoing cases were decided. They will be found to be ineffective as deeds, because not in accordance with some rule of law, or be voidable because they grant estates and were procured by undue influence, mistake or fraud. In Turner v. Scott, 51 Pa. 126, and Frederick's Appeal, 52 Pa. 338, the deeds were held to be testamentary and therefore revocable.

In Russell's Appeal, 75 Pa. 279, a lady in contemplation of

marriage executed a deed of settlement in which she provided for payment of the income of her estate to herself for life, and after her death to her children, if any, and if not, to her brother and sisters. There was no power of revocation. Her husband died leaving her childless. She had been advised that she could dispose of her property by will, though there was no such provision in the deed. The deed was made in view of marriage and no other purpose appeared. The court held that there was a mistake of fact and not merely one of law, against which equity could grant relief as against mere volunteers. The court says: " It may be admitted that the mere omission of counsel to advise the insertion of a power to revoke will not alone be ground in equity to set aside a voluntary conveyance. But the absence of such a power, and the failure of counsel to advise upon it, are circumstances of weight when joined to other circumstances tending to show that the act was not done with a deliberate will. The court, however, says : " There may be reasons for continuing the disability intended by the grantor or settlor which would influence the chancellor to maintain it, as where a settlement is made for self-protection against improvidence, or the urgent importunities of others, which the circumstances show it is difficult for the grantor or settlor to resist." Page 289.

Darlington's Appeal, 86 Pa. 512, was a case in which a married woman made a voluntary conveyance of all her estate to her husband, and the controversy was between her own child and the children of her husband by a former marriage. It was held that the confidential relation between the husband and wife required affirmative and positive proof that it was her voluntary act and not induced by undue influences.

In Rick's Appeal, 105 Pa. 528, it was held that the evidence " tends strongly to show that Mrs. Peiffer signed the deed of trust in ignorance of its legal effect; that she had no intention of depriving herself of all control of her property in the future and that her brother, in whom she confided, misled and deceived her. If Mrs. Peiffer signed the deed under the representation that it could be revoked, then a fraud was practiced upon her, if under the advice that she could not insert a power of revocation, she was wrongly advised. She acted under a mistake, partly of law and partly of fact; she was misled by those whose

duty it was to inform her. . . . Not only was the deed irrevocable in its terms, but it was improvident." But the court further says: " It would be unwise in us to hold that a person may not make an irrevocable gift, nor would the authorities sustain it. There may be instances in which it is to the highest interest of a man to place his estate beyond his control irrevocably. He may do so to protect himself against his own infirmities. The intent to make the gift irrevocable should be clear." The court thus recognizes the principle of Reese v. Ruth and Reidy v. Small.

In Miskey's Appeal, 107 Pa. 611, it appeared that Jacob A. Miskey had made a deed by which he conveyed his entire estate, about $70,000, to his father, reserving for himself the income during his life, making no provision for his wife and but a slight provision for his son; that Miskey was a drunkard, and largely under the influence of his father, and the deed was prepared by his father's attorney; there was no power of revocation and no testimony in the case showing that this fact was known to him, or was in any manner explained to him; that it did not appear that the deed was read over or explained to him at or before its execution, etc.

The court held the principles recognized in all the cases, " that whenever one person obtains by voluntary donation a large pecuniary benefit from another, the burden of proving that the transaction is righteous falls on the person taking the benefit. But this proof is given if it be shown that the donor knew and understood what it was that he was doing." Especially is this the case where the donee stands in a confidential relation to the donor. And that where there is no power of revocation in such a deed, and no reason appears why it should be irrevocable, it is a fact with other circumstances tending to show that it was not executed with proper advice and understanding. Justice GREEN very fully cites and considers the authorities upon these questions, and concludes that in no case was there so strong a combination against the validity of the instrument in question as found in that case.

These cases establish the principles upon which this case should be determined, and it therefore appears to be unnecessary to refer to the many cases decided in the courts of England and of other states, especially as most of them are considered in one

or more of the cases above cited, and some of them are inconsistent with the cases decided by our own courts.

Counsel for defendants have requested the court to find the following facts:

First. That when the trust deed was executed George B. Neal was not, nor is he now, able to manage and control his property, and the purpose of it was to protect his estate and prevent the same from being squandered or wrested from him by designing persons. This is found to be true as stated.

Second. That it was prepared in pursuance of advice of Neal's physician and after a family consultation and with the advice and approval of his grandmother, with whom he had lived and who had raised him from infancy. This is found to be true except that Dr. Willard, who so advised, was not at that time his physician, but had been from infancy until he was sixteen or seventeen years old.

Third. That all George B. Neal's estate covered by the trust deed came from his grandfather, George Black. This is found to be true.

Fourth. That George B. Neal, prior to its preparation, realized that he was not able to manage his estate and requested that the management and control of the same should be put in the hands of his uncle, William H. Black, who should appoint Thomas H. Lane the trustee when his account as guardian should be confirmed, and that this was done as agreed upon. This is found to be true.

Fifth. When the trust deed was executed Neal knew of what his estate consisted and the amount of the same, and said deed was executed by him after the fullest explanations of it, without any solicitation from any one, and with a full knowledge of its provisions, and after he had changed it in two important particulars. This is found to be substantially true. We would strike out the word "fullest" and insert "very careful." "Full knowledge of its provisions" is perhaps too strong an expression. He appears to have had full information of its provisions and we believe an understanding of its general purpose and effect. The testimony does not show any solicitation, though he acted on the advice of William H. Black and Mr. Lewis.

Sixth. There was no fraud or deceit or misrepresentation on

the part of any one connected with the preparation or execution of said deed, and the deed itself preserved the estate for Neal's own use, and subject to his disposition by will. There was no attempt to control it except for Neal's own good. This is found to be true.

Seventh. Neal's marriage was secret and unknown to his family. He remained satisfied with the trust deed for over five years, and was induced to begin proceedings for its revocation after his marriage on the advice of one Gamble, an uncle by marriage. The best interest of Neal would be subserved by upholding the deed, and the attempted reservation would put his property in the peril it was the purpose of the trust deed to avoid. This is found to be true. But the last sentence is a matter of opinion and not of fact.

Upon full consideration of all the evidence in the case we find as matters of fact:

That the plaintiff, George B. Neal, arrived at the age of twenty-one years on the 26th day of September, 1889. On the 19th day of October, 1889, he executed the deed of trust in dispute. In pursuance of authority contained in said deed William H. Black appointed Thomas H. Lane as trustee in his stead and conveyed the property to him, who from that time to the present has performed the duties of the trust; that George B. Neal was satisfied with this arrangement until about the 24th day of February, 1894, when he executed a deed revoking the trust made October 19, 1889. That Thomas H. Lane refused to recognize the validity of this revocation, and this bill was filed to enforce the same. George B. Neal, at the time the deed of trust was executed, October 19, 1889, though of weak understanding, and by reason thereof wholly inexperienced in business, and of less than ordinary intelligence, was competent to make a valid deed and capable of understanding the general purpose of such a transaction and means by which it was to be effected. That Mr. Lane was selected by him to be the trustee, and he was informed why it was necessary or advisable to appoint Mr. Black in the first instance.

Before the deed was executed a statement of his property was made out by his guardian and submitted to him by William H. Black, who informed him of its contents, at least to the extent of the estate. Black consulted with W. A. Lewis, a reputable

and competent attorney, and when the deed was prepared, Neal, with Black, visited Mr. Lewis, who carefully explained the matter to Neal, and after discussion with him the clause in relation to the disposition of the income and making the trust irrevocable was inserted in accordance with Neal's conclusion as to what was best. Lane had no knowledge of the deed until after its execution. Neal had no advice or counsel from any one other than William H. Black and W. A. Lewis. William H. Black is the uncle of George B. Neal and they lived in the house of Mrs. Black together until a few months before the execution of the deed. Black acted upon the advice of Dr. Willard and after consultation with his mother and other members of the family as to the object of the transaction, but it does not appear that he consulted any other person than Mr. Lewis as to the mode of effecting it. He, however, took no interest under the deed and was therefore wholly disinterested. Lewis was not Black's attorney but had acted for Neal in having Lane appointed guardian. Neither Black nor Lewis had any interest to serve other than that of Neal's, and, so far as appears from the character of the men, we are satisfied that they acted and advised Neal solely for what they regarded his best interest. They were independent and unprejudiced advisers. Thomas H. Lane, the trustee, was a proper selection. He has shown his faithfulness and ability by the successful management of this estate as guardian.

In view of the control of the courts over the trustee and the estate the deed is in no respect improvident, and considering the incapacity and inexperience of Neal, the amount of his estate and the large income derived from it, it seems to have been eminently wise and prudent. There does not appear to have been any marked improvement in his condition as to mental power or business capacity in the six years which have elapsed since the execution of the deed, so that the same conditions which made its execution advisable still exist as reasons against its revocation, and that it is not for the interest of plaintiff that it should be revoked.

As matter of law we find that the plaintiff has not the power arbitrarily to revoke a deed voluntarily made : that such revocation is subject to the judgment of the court, and should not be ratified unless it appear that the best interests of the plaintiff so require.

Under the facts and law of this case we are of opinion that the deed of October 19, 1889, should not be revoked and that plaintiff's bill should be dismissed at his costs. A decree will be drawn accordingly.

We feel disposed to add as an apology for this lengthy opinion the words of Justice GREEN in Miskey's Appeal, 107 Pa. 632 : " It has seemed to us appropriate to dwell with rather more than usual fullness upon our view of the case because of the unusual character of the questions involved and the relief invoked, the very large amount at stake and the earnestness, zeal and ability with which the argument was conducted by the learned counsel on both sides." And besides, we do not have the benefit of a master's report, and though we are satisfied that the new rules in equity will greatly facilitate business and be of advantage to parties, counsel and the courts, it necessitates a fuller reference to testimony and of the cases bearing upon questions of law, than was necessary in passing upon exceptions to a master's report.

*Error assigned* among others was decree dismissing bill.

*W. B. Rodgers*, with him *Joseph Stadtfeld* and *J. H. Beal*, for appellant.—The deed was procured from Neal by persons occupying a confidential relation towards him : Espey v. Lake, 10 Hare, 260 ; Tate v. Williamson, L. R. 2 Ch. App. 55 ; Dutton v. Thompson, L. R. 23 Ch. D. 278 ; Williams v. Williams, 63 Md. 371 ; Hegunin v. Baseley, 2 W. & T. Ldg. Cas. Eq. 597 ; Darlington's Est., 147 Pa. 624 ; Wright v. Smith, 23 N. J. Eq. 106.

The fact that the deed contains no power of revocation of itself puts on the defendants the burden of proof : Coutts v. Acworth, L. R. 8 Eq. 558 ; Garnsay v. Mundy, 13 Am. L. Reg. 345 ; Russel's App., 75 Pa. 269.

In order to sustain this deed, defendant must show, by clear and decisive proof (Toker v. Toker, 3 De G. J. & S. 487) : (1) That Neal had a true and full knowledge of his estate, its extent and value, and of the income to be derived therefrom ; (2) that he had independent advice in regard to the act which he was performing ; (3) that his act was uninfluenced and unbiased by the confidence he reposed in Lewis and Black ; (4) that the terms and provisions of the deed are reasonable

proper and provident; (5) that he had a full, clear and intelligent understanding of the act he was engaged in and of the effect and consequences of the deed which he was executing.

They must show that Neal had a true and full knowledge of his estate, its extent and value, and of the income therefrom: Taylor v. Taylor, 8 Howard, 183; Wills' App., 22 Pa. 332; 13 Am. L. Reg. 350; Prideaux v. Lonsdale, 4 Giff. 159; Rhodes v. Bate, L. R. 1 Ch. App. 252; Miskey's App., 107 Pa. 611; Archer v. Hudson, 7 Beav. 351; Huguenin v. Baseley, 14 Vesey, 287; Kerr on Fraud, 178.

The deed is improvident in that it strips Neal of all his property without any valid reason therefor; it contains no power of revocation; it leaves him at the discretion of the trustee as to the portion of the income he shall receive from his own property; and because it makes no provision for future contingencies or emergencies the deed is improvident, because it gives unsafe and unwise powers to the trustees: Rick's App., 105 Pa. 535; Whitridge v. Whitridge, 76 Md. 54.

Neal is given no voice in the management of the property or in the selection of future trustees: Everitt v. Everitt, L. R. 10 Eq. 405; Wollaston v. Tribe, L. R. 9 Eq. 44.

The effect of the deed of settlement must be brought home to the mind of the party: Welman v. Welman, L. R. 15 Ch. D. 570; Henshall v. Fereday, 27 L. R. N. S. 743; Simon v. Simon, 163 Pa. 292; Phillipson v. Kerry, 32 Beav. 628; Gibbs v. Trust Co., 14 Abb. N. C. 1; Ross v. Conway, 92 Cal. 632; Anderson v. Ellsworth, 3 Giff. 154; Dutton v. Thompson, L. R. 23 Ch. D. 278.

*David T. Watson*, of *Watson & McCleave*, for appellees.—An examination of the trust deed shows it was most carefully drawn to protect Neal's property for Neal, and no one else concerned in it was benefited by it; independent advice was not absolutely necessary: Hunter v. Atkins, 10 Eng. Chanc. (2 Myl. & Keene) 112.

The case at bar differs from every case cited and relied on by the appellant, and most palpably in the following particulars: (1) It is a present absolute legal conveyance whereby the title vests in the grantee; (2) it has provisions in the nature of a spendthrift thrust whereby the estate is protected against the

improvident contracts and acts of the settlor; (3) the trust is an active one and gives discretion to the trustee, which may always be controlled by the court; (4) the whole estate is settled for Neal's own use. No one except through him, as his appointee or heir, can obtain any portion of it, and by his power of appointment he may give it after his death to whomever he chooses; (5) on its face it recites his inability to manage as the reason for its execution, and the fact of such inability is fully proved by the witnesses on both sides, so that even if Neal revoked the trust deed some one would have to be employed to manage his estate; (6) it is by the settlor's own request made irrevocable: See Roddle v. Cutter, 49 Iowa, 554.

*W. B. Rodgers*, with him *Joseph Stadtfeld* and *J. H. Beal*, for appellant, in reply.—As a spendthrift trust this deed is clearly bad: Mackason's App., 42 Pa. 330; Ghormley v. Smith, 139 Pa. 584.

The provisions as to a spendthrift trust being stricken down, all that is left is a mere power of attorney—an agency—which is revocable at will, even if it be made irrevocable in terms: Frederick's App., 52 Pa. 338; Rick's App., 105 Pa. 528; Green v. Rick, 121 Pa. 130; Russell's App., 75 Pa. 279.

In Ashhurst's App., 77 Pa. 464, and Ash's App., 80 Pa. 497, no question as to the validity of the trust instruments was raised; the question was whether they were active or passive trusts.

In Reese v. Ruth, 13 S. & R. 434, it was whether the cestui que trust could maintain assumpsit against the trustee.

Ritter's App., 59 Pa. 9; Fellow's App., 93 Pa. 470 were (as shown in Rick's App., 105 Pa. 528) decided on the ground of vested interests in third parties: Merriman v. Munson, 134 Pa. 144. Riddle v. Cutter, 49 Iowa, 554, belongs to the same class.

Reidy v. Small, 154 Pa. 505, is an entirely different case.

Phillips v. Mullings, L. R. 7 Ch. App. 244, was a deed for only one third of the grantor's property, and was shown to be his deliberate act, and throughly understood by him.

PER CURIAM, October 5, 1896:

We find no error in this record that would justify either a reversal or modification of the decree. The learned judge's

findings of fact and conclusions of law are substantially correct, and fully warranted the decree dismissing the bill at plaintiff's costs. There appears to be nothing in either of the specifications of error that requires discussion.

The decree is affirmed and appeal dismissed with costs to be paid by the appellant.