## Spring, Appellant, v. Hawkes.

Argued January 5, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Thomas Raeburn White*, with him *Ira Jewell Williams, Ira Jewell Williams, Jr.*, and *White & Williams*, for appellant.

*H. James Sautter*, with him *Isaac J. Vanartsdalen* and *C. Brewster Rhoads*, for appellee.

OPINION BY MR. JUSTICE LINN, March 19, 1945:

Plaintiff appeals from the dismissal of her bill charging the defendant with numerous breaches of trust. After an extended trial, Judge BOYER filed an adjudication dismissing the bill. Plaintiff's exceptions were dismissed by the court in banc.

The adjudication and the opinion of the court show that the case was thoroughly considered. There is evidence to support the findings of fact which, approved by the court in banc, are accepted here: *Walton Estate*, 348 Pa. 143, 34 A. 2d 484.

Appellant complains that the defendant, as trustee, ". . . acquired treasury stock of a corporation for himself individually through the use of preemptive rights

which belonged to the trust res and for which he paid no consideration . . ."; that he was permitted to retain these shares of stock on showing that the plaintiff had consented to the purchase, at a time when a confidential relation existed between them, and appellant had no independent advice; that he was permitted to retain a salary, alleged to be excessive, paid to him by the corporation; that the court erred in adjudging the plaintiff guilty of laches.

The business relations of plaintiff and defendant were agreeable and harmonious for the period following the death of her first husband, July 20, 1920, until about 20 years later.[1] Defendant had been her husband's attorney since 1918. In October, 1918, her husband, with about $30,000 borrowed from his uncle, Mr. Bowen, purchased 348 shares of stock thus acquiring a majority stock interest in Ward-Davidson, engaged in manufacturing turkish towels and similar textiles. When appellant's husband died, she was 29 years old, with a son about two years of age. Her husband gave his property to her by will of which she and the defendant were named as executors. Their executors' account, filed in the Orphans' Court of Philadelphia, showed a small balance of personalty; in addition, her husband left a small investment in real estate; the learned chancellor was unable to state the value of the real estate with certainty but concluded she received from her husband personal and real estate probably worth from $5,000 to $7,000. Appellant was thus deeply concerned about the sufficiency of her husband's estate to support her and her infant son.

---

[1] The 61st Finding of Fact is: "61. There was never any disagreements or dissensions between them excepting once in 1935, when Plaintiff repeated to Defendant a criticism of the company and his management which she heard and for the time believed and which he deeply resented and contradicted and for which she later apologized. In that year she consulted private counsel and submitted the Deed of Trust for his opinion."

The books of the Ward-Davidson Company at the time of Mr. Davidson's death showed a "substantial surplus" though the company owed considerable sums to banks on paper endorsed by Davidson. The active practical men in the business were two comparatively young men, Mr. Ward and Mr. Scott. In 1920 defendant [2] was elected a director of the corporation, and became chairman of its finance committee—a position he held at the time of Mr. Davidson's death. After that, defendant was elected president and, by pledging his own credit with the company's bank creditors and with the "aid of Messrs. Ward and Scott made the business a success."

It was considered necessary to supply the plaintiff with an income on which to live, as her husband's estate, if then liquidated, would probably have been insolvent. She had no business experience but, nevertheless, on August 30, 1920, was made Secretary [3] of the corporation, and was paid a liberal salary and from time to time received "bonus" payments as other officers received them. Her husband's indebtedness to his uncle, Mr. Bowen, required attention. She advised with him at various times concerning her finances as well as the business of the corporation; she also advised with her father. Her situation and that of the corporation were also considered by the defendant, and one result of the general consideration was the execution of the Deed of Trust

---

[2] Among the Findings are: "294. The Defendant is a reputable, practicing lawyer, a member of the Philadelphia Bar for fifty years. He is over seventy years of age. . . . 296. He has been specializing in corporation law and corporate managerial work, and has had a large and varied experience in advisory and executive corporate capacities."

[3] "The plaintiff performed no official duties as secretary other than attending all of the meetings of the stockholders and the Board of Directors, signing and reading the minutes of the previous meetings and assisting in the conduct of the annual election of officers." During the trust period "The Plaintiff's average so-called salary was $3,786.54 per year." Defendant's average salary during the same period was $4,115.90.

dated December 28, 1921, by which she transferred to defendant as trustee, 345 out of 348 of the shares of stock bequeathed to her by her husband. The result of course was that by voting the stock in the trust, defendant could control the corporation, the total number of shares issued being 632. The term of the trust was twenty years, said to have been so fixed to cover the minority of plaintiff's son. There is evidence that the deed of trust [4] was suggested by the plaintiff's father. The deed was drawn by counsel who represented her and the defendant as executors of her husband's estate. She signed a letter, drafted by counsel, addressed to the defendant, stating the reasons [5] for making this deed of trust. Prior to the execution of the deed, and thereafter defendant received a salary and bonuses from the corporation which the chancellor found were paid for services he rendered to the corporation. From time to time treasury stock was issued. The plaintiff was given the right to take it and declined it. She objected to its being taken in the trust and assented [6] to the defendant's

[4] The 129th and 130th findings are: "129. The Defendant informed the Plaintiff that if he were to manage the operation of the company, he would require a Deed of Trust of her shares of stock for that purpose. 130. The Defendant was then under no moral or legal obligation to undertake its management."

[5] The reasons, briefly stated, were to: "(a) Encourage two indispensable employees, Ward and Scott, to continue in the company's employ; (b) to protect defendant's individual endorsement of company notes; (c) for the firm and successful establishment of the business; (d) to prevent plaintiff from dissipating the assets and to preserve the same for her son's benefit." The 143rd finding is: "The Defendant's judgment on that subject was vindicated by the saving of the Davidson Estate assets, the company's survival of the national financial crisis, its present condition and Plaintiff's income during the trust period. 144. In addition to the Defendant's aid and advice, the Plaintiff had the opportunity and benefit of consultation with, and advice of, their estate attorney, H. James Sautter."

[6] The pertinent findings are: "209. During the time treasury stock was being sold, Defendant discussed with Plaintiff the question of her losing her majority control and told her that she would lose

purchase of the stock. As a result of new issues of treasury stock and of purchase from other stockholders, defendant, individually and as trustee, became the holder of the majority of the shares. The relations of the parties ceased to be harmonious shortly after she married her present husband in 1941.

The corporation had good years and bad years but on the whole flourished and the evidence supports the chancellor's finding that defendant's services were material elements in its success. In 1932, defendant prepared an account to June 24, 1932, with the intention of filing it in court and so informed plaintiff. She approved it in writing (cf. *Wilbur's Estate,* 334 Pa. 45, 55, 5 A. 2d 325) and requested that it not be filed for audit.[7]

it if she allowed Messrs. Ward and Scott to purchase the stock. 210. What stock she bought, or was bought for her in the Trust, was purchased only on the recommendation and urging of the Defendant. 211. The Plaintiff definitely and repeatedly objected to taking any further shares of stock both personally and for the trust. She did not have a good opinion of Ward-Davidson stock as an investment from the beginning and did not want any more, stating that she wanted her bonus in money rather than stock. 212. The Plaintiff expressed resentment at Defendant's having purchased new stock for the trust over her protest. 213. Prior to the loss of the majority control by Plaintiff, the Defendant explained the whole situation to her, telling her that if Messrs. Ward and Scott bought all of the new issues of stock, she would lose her majority and they would secure the control. 214. Plaintiff told him that she did not want that to happen, but that if he, the Defendant, would purchase enough shares for himself personally 'to be in the middle' she would be satisfied. 215. They finally acted on that plan and the Defendant bought sufficient stock in his own name so that his personal stock; together with the Plaintiff's personal and trust stock would constitute a majority. Likewise, his personal stock together with that of the other stockholders, other than the Plaintiff, would also constitute a majority."

[7] On December 23, 1941, defendant filed his first and final account of the trust in the Orphans' Court of Bucks County. The 332nd Finding is: "This settlement shows that he had in his hands, in addition to the certificates of stock for 429 shares of the Ward-Davidson Company, a balance of principal for distribution of $46,-630.02 and balance of income for distribution of $14,334.26, or a total of $60,964.28. It was admitted at trial that he has since re-

Plaintiff's bill was filed January 30, 1942. In dealing with the preëmptive right [8] to purchase treasury stock, the learned chancellor said that while these rights had theoretical value they had no actual value from 1925 to 1930. Concerning this stock, some of which was sold to the defendant, the court found that it was not sold at a price so much below book value "as to throw any light or suspicion on the conduct of the defendant in purchasing the same". He added that, after the interval of from 13 to 17 years since that stock was sold, it was impractical or impossible fairly to ascertain the actual market value of the stock when issued, and that he could not make such a finding from the record. He found specifically that none of the stockholders considered the preemptive right to purchase the stock of any importance or of intrinsic value.

In appellant's brief it is said: "The record is very long and most of it is immaterial to this appeal as the findings of fact of the court below on conflicting evidence are not contested." It is clear that we must overrule the assignments of error complaining that defendant was allowed to retain this stock in the circumstances stated. It is equally obvious, if the case turned on the point, that appellant's 13 years' delay would be a bar. Compare *Walton Estate*, 348 Pa. 143, 146, 34 A. 2d 484.

The fact that a confidential relation existed between the plaintiff and the defendant, does not militate against the conclusion reached by the learned chancellor; it was only one of the elements in the problem that he was called on to consider. Defendant sustained the burden of proof. It is argued on her behalf that she was entitled

---

ceived $5,000.00 additional, making a total of $65,964.28. If the above shares of stock are valued at $50.00 per share that would be an additional sum of $21,450.00, making a total balance for distribution of $87,414.28."

[8] For the present status of preëmptive rights, see section 611, Business Corporation Law, Act of May 5, 1933, P. L. 364, 15 PS section 2852-611.

to independent advice. This subject was considered at length by the learned court. Specific findings on the subject were made to the effect that she knew what she was doing and understood the reason and the purpose for doing it; that there was no "fraud, deceit, misrepresentation, coercion, undue influence or abuse of confidence . . ."; that the terms of the deed, considering its purpose, "were generally fair, just and equitable"; that she consulted with counsel representing her and the defendant, executors of her husband's estate; that she consulted with her father, "who, on behalf of Plaintiff, had suggested a Deed of Trust to Defendant"; that she "consulted with, and was advised by, her late husband's uncle, Harry Bowen, a man of wealth and business experience, on her business and financial affairs"; that she discussed the affairs of the company with a Mr. Henry, "a member of the Philadelphia stock brokerage firm of Biddle & Henry". We must therefore reject the argument based on the assertion that she was not advised. Compare *Neal v. Black,* 177 Pa. 83, 35 A. 561; *Clark v. Clark,* 174 Pa. 309, 34 A. 610; *Thorndell v. Munn,* 298 Pa. 1, 8, 147 A. 848.

The remaining contention urged by the appellant is stated in her brief to be that "Defendant must account to the Plaintiff for excessive compensation received by him as an officer of companies which, as trustee, he controlled". The salaries were fixed by the Board of Directors of which the plaintiff was a member; that they were paid appeared in the annual reports which she received at the time. The learned chancellor said, "As to what bearing it may have on the question of the Defendant's honesty or good faith, we are impressed with three facts, namely; that his average compensation for the twenty-year period does not on its face appear excessive; that during the less prosperous period following 1929, the compensation was voluntarily reduced to an amount that was clearly inadequate; and that Plaintiff's high salaries were identical with Defendant's, each of which

considerations would tend to remove suspicions of dishonesty or overreaching." He was, however, of opinion that if the salaries were excessive, the remedy was with the corporation and that the point was not relevant in this proceeding. He also added that, ". . . excepting as to the last few years, such a remedy in this proceeding, if otherwise valid, would be barred by laches."

We agree that if the point is relevant, a matter we need not discuss, plaintiff's participation in establishing and paying these salaries in the circumstances stated in the record is in itself a complete bar. Compare *Walton Estate,* 348 Pa. 143, 34 A. 2d 484.

It is unnecessary to discuss cases which the parties have cited. There is no room for dispute of applicable law. There has been no relaxation of the high standard of duty required of a trustee, as set forth, for example, in Restatement, Trusts, sections 170, 173, and 179. If the beneficiary, with knowledge [9] and for her own benefit, provides a different standard by contract with the trustee, she may be held to it. The deed contained an exculpatory clause relieving the trustee from liability for conduct except "wilful misconduct or gross negligence" a permissible provision: *Gouley v. Land Title Bank & Trust Co.,* 329 Pa. 465, 198 A. 7. No complaint appears to have been made on behalf of plaintiff's son, who, on attaining his majority, took no steps challenging the acts of the trustee.

The learned chancellor stated: "After the termination of the trust, but prior to this litigation, the Defendant, together with Messrs. Ward and Scott, made an alternative offer to sell their stock to the Plaintiff at par, or else to buy her stock at par. This offer was made to end any dissatisfaction as to stock control of the corporation. Both offers were refused by Plaintiff."

Decree affirmed at appellant's costs.

---

[9] Compare *Walton Estate,* 348 Pa. 143, 34 A. 2d 484; *Stutzman v. Barnhart,* 318 Pa. 285, 287, 178 A. 673; *Miggett's Estate,* 109 Pa. 520, 522; *Grim's Appeal,* 105 Pa. 375, 383.