# Reidy *v.* Small, Appellant.

[Marked to be reported.]

*Trusts—Voluntary deed of settlement—Clause of revocation.*

The absence of a clause of revocation in a voluntary deed of trust for the settlor's benefit, is not itself a ground for setting aside the deed. It is a circumstance to be taken into account, and is of more or less weight, according to the other circumstances of the case.

A man seventy-three years of age, of intemperate habits, fearing insanity, which was hereditary in his family, executed a voluntary deed of trust of all his estate to his daughter, who was his only child and only near relative. The deed provided that the whole income should be paid to the settlor, and he was given the power of testamentary disposition of the property. The only benefit to the trustee was the right to legal commissions. The settlor, apart from his intemperate habits, was of a saving disposition, but without business ability, and his daughter, who was a capable business woman, had, for a long time prior to the settlement, man-

aged his affairs. The daughter was not guilty of any fraud in procuring the deed, and the settlement was not suggested by her. The deed contained no clause of revocation. *Held,* that the absence of a power of revocation was immaterial, since its presence would have defeated the object of the trust, and that the settlor was not entitled to a revocation of the deed.

Mr. Justice MITCHELL dissented.

Argued March 29, 1893. Appeal, No. 297, Jan. T., 1893, by defendant, Jennie A. Small, from decree of C. P. No. 1, Phila. Co., March T., 1890, No. 914, dismissing exceptions to master's report in favor of plaintiff, Philip Reidy. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ.

Bill for revocation of voluntary deed of settlement.

The case was referred to John C. Grady, Esq., as examiner, and to Owen Wister, Esq., as master.

The master reported the following facts:

"Philip Reidy, the plaintiff, came to America in 1849, and worked as a printer for a number of employers, chiefly Harper & Brothers, with whom he stayed some fifteen years or more. He came to Philadelphia in 1867 or 1868, and was employed by James Elverson for about ten years as foreman of the press room of "Saturday Night." His family consisted of a wife, now dead, her niece and nephew, and one daughter, a defendant in the present case, who married Dr. Small, the other defendant, in 1872. His wife took boarders and helped support her niece and nephew, buy furniture and dress the daughter, whose sewing-machine earnings paid for some household expenses, and also contributed chimney-piece ornaments, pictures and a piano. About 1854, the plaintiff bought with his savings a property in Forty-fourth street, New York, which subsequently was sold for more than double its cost. This, together with other properties in and near Philadelphia, at various times acquired by the plaintiff's money, forms his estate. For many years previous to 1887, which was the year the deed of trust was executed, now sought to be canceled, he had been content to have his daughter, the defendant, manage all his affairs. His temperament was morbid, both by inheritance and disease, and it became a relief that some energetic person should take the burden of practical matters from his shoulders. When necessary, he gave Mrs. Small powers of attorney, and she exe-

cuted all sales, mortgages and purchases of his property, and even at times bought his clothes for him.   It was when daughter and father had long stood in these relations to each other, that on the 12th of May, 1887, he made her his trustee by a deed that contained no clause of revocation.   The notion of such a deed originated with neither father nor daughter.   Early in the year 1885, during one of the fits of depression and apprehension to which the plaintiff has been subject, the plaintiff suggested some arrangement should be made by his daughter by which his daughter could control his affairs, without the necessity of his consent to each act.   What the plaintiff's precise fears were, whether of extravagance, or insanity, or of being waylaid into marriage, or whether he feared his daughter might die and leave him without a manager, it is unnecessary to determine.   It is clear that the plaintiff desired some arrangement that should save him from likely or unlikely dangers. Desirous of finding if such legal arrangement could be made, his daughter told the circumstances to the trust officer of the Guarantee Trust Company, Mr. Winship, and he recommended a trust deed.   Mrs. Small returned and explained to her father that something could be done, and the matter then rested till late in 1886, when Mr. Reidy and his daughter were in a law office in New York, and he suggested to her that it would be timely to complete the arrangement.   Mr. Ogden, the gentleman in whose office they were, heard their views, and he also recommended a deed of trust.   Early in 1887, this step was decided upon by father and daughter, and Mr. Roland Evans in Philadelphia drew a deed for them at the suggestion of his cousin, Mr. Ogden, in New York, who had there drawn a similar deed to cover the New York property.   It was Mrs. Small exclusively who conducted all the talk and correspondence, and it was to her Mr. Evans wrote, appointing a meeting.   Mrs. Small had no special instructions to give, except provision for a trustee to succeed in place of her death.   This was the expressed wish of Mr. Reidy, who, beyond that, expressed nothing, and performed an entirely passive role throughout the transaction, going where his daughter took him, assenting to all things, and, when the time came, signing the deeds at Mr. Evans's office, where his daughter had brought him from the hospital he was then living in.   Mr. Evans saw the plaintiff

twice, once when the draft of the deed was submitted for his approval, and once when he signed it. But Mr. Evans's dealings were entirely with Mrs. Small and not with Mr. Reidy, whom he never saw except in her company ; and though the deed was certainly read to Mr. Reidy, its legal significance was not made clear to him, and nothing seems to have been said by anybody about the absence of the clause of revocation.

" Mr. Reidy became dissatisfied with the administration of his affairs. He found his income insufficient to support him, and finally desiring to control his property again, discovered that he could not do so under the deed, which he says he never would have signed had he understood it would be irrevocable.

" The master also finds that, whatever habits of intemperance the plaintiff may have had before 1880 or 1881, he succeeded in laying by money enough to acquire property as early as 1854 ; and, since 1881, the defendant herself admits repeatedly that he has been moderate. On the whole, the testimony does not show sufficient ground for bringing his case under the head of that class called ' spendthrift trusts.' "

The master further found that there was neither fraud nor conspiracy on the part of defendants, and that the deeds created an active and not a passive trust. He also found " that Mr. Reidy's signing of the deeds was not his own act in the required legal sense of the word, because he was not ' protected by independent advice,' and was not made to understand the legal effect of the instrument." . . . .

" The master accepts the view of the defendant's counsel, where he says that there are cases of this sort where deeds have been set aside without proof of fraud, when the party was not properly advised as to the nature of his act. Russell's Ap., 75 Pa. 269.

" On examining the English and Pennsylvania cases that apply, it is found that the latest view is not the extreme one of such a case as Mountford v. Keene, 19 W. R. 708, where it might seem that the mere absence of the clause of revocation is held enough ground for setting a deed aside. The words of Sir W. M. James, L. J., in Hall v. Hall, 8 Ch. Ap. 430, page 438, that such absence ' is a circumstance to be taken into account, and is of more or less weight according to the circumstances of each case,' express the rule and follow Lord Justice

TURNER in Toker v. Toker, 3 De G. J. & S. 487, who also says, 'questions of the nature of that before the court must depend on the evidence.' Another part of the rule in such cases can be seen in Phillips v. Mullings, 7 Ch. Ap. 244, where Lord HATTERLY says that anyone taking an advantage under a voluntary deed and setting it up against the donor, 'must show that he thoroughly understood what he was doing, or, at all events, was protected by independent advice.'

"That the deed gives here only an indirect advantage to those who set it up against the grantor, namely the advantage of preventing him from using his capital in order that they may inherit it, is not a sufficient distinction to render it unnecessary for him to have been 'protected by independent advice,' when he was tying up his property irrevocably; or, in the language of Lord ELDON in Hatch v. Hatch (quoted by the Supreme Court of Pennsylvania in Greenfield's Estate, 2 Harris, at page 507), a grantor should have taken 'fair, serious and well-informed consideration' before assenting. To the same effect are Russell's Ap., and Solms v. The Philadelphia Trust Company, 16 W. N. 80, where the court says, page 83: 'Voluntary settlement is irrevocable . . . . unless it can be shown that it was obtained by fraud or imposition or executed under a misapprehension of fact or of its legal effect.'

The master accordingly recommended a decree canceling the deed.

Exceptions by appellant were dismissed by the court.

*Errors assigned* were, (1) in not dismissing plaintiff's bill; (2) in confirming the master's report; (3) in decreeing a reconveyance of the trust property; and (4–15) in dismissing exceptions, quoting them.

*Edwin F. Schively* and *Geo. Tucker Bispham*, for appellant. —Where the principal object of the bill is relief on the ground of fraud, and plaintiff fails to prove fraud, the court may dismiss the whole bill, and the rule applies where actual or moral fraud, exists whether the word fraudulent is used or not: Maguire v. O'Reilly, 3 J. & La. T. 224; Tillinghast v. Champlin, 4 R. I. 173; Wilde v. Gibson, 1 H. L. C. 604; Bank v. Stone, 2 R. I. 129; Edwards v. Brightly, 44 Leg. Int. 132; McConomy v. Reed, 152 Pa. 42.

The proof is sufficient to support the responsive answer: Burke's Ap., 99 Pa. 359; Fidelity Co. v. Weitzel, 152 Pa. 498.

If plaintiff really did not understand the nature of the deed, it was because he neglected to ask an explanation of its terms. A party who is able to read, and reads an instrument over himself and signs it without asking any explanation, cannot afterwards set up that he did not understand what he was about: Thomas v. Loose, 114 Pa. 45; Kesler's Est., 143 Pa. 386; Phillips v. Mullings, 7 Ch. Ap. 244.

While some of the English cases at one time gave color to the doctrine that the absence of a clause of revocation unexplained renders the deed void, the later decisions have repudiated so extreme a position and have gone back to the rule laid down by Lord Justice TURNER, in Toker v. Toker, 3 De G., J. & S. 487, viz: that the absence of the power of revocation is a circumstance to be taken into account and has more or less weight according to other circumstances of each case. See Hall & Hall, 8 Ch. Ap. 438. This view was expressly approved by Mr. Justice AGNEW, in Russell's Ap., 75 Pa. 269, and he expressly holds the mere omission of counsel to advise as to the insertion of the power will not alone be a ground in equity to set aside a voluntary conveyance, but that the absence of such a power and failure of counsel to advise upon it, are circumstances of weight, when joined with other circumstances tending to show that the act was not done with a deliberate will. See also Phillips v. Mullings, 7 Ch. Ap. 244.

We submit that this case is ruled by the decision in Merriman v. Munson, 134 Pa. 131. See also Solms v. Phila. Trust Co., 16 W. N. 80; Ashhurst's Ap., 77 Pa. 464; Villers v. Beaumont, 1 Vern. 100; 1 Perry on Trusts, § 104; Bispham, Equity, 106, § 67; Hoblyn v. Hoblyn, 41 Ch. Div. 200.

The settler, an old man, having a constant well-grounded fear of insanity, addicted to habits of intemperance, and never used to the care or management of his property, makes a settlement to secure for himself, as the deed expresses it, " an inalienable personal provision during his life," reserving his full power of disposition at his death. The trustee is his own daughter, who has every interest to conserve his property, but who can never enjoy a penny of it except by his express gift. Could there be a more provident settlement than this?

*Lewis Stover*, for appellee.—Where the grantee in a voluntary deed stands in a fiduciary capacity to the grantor, taking a considerable interest under the deed, the burden of proof is upon him to show that the grantor fully understood the legal effect of the deed he signed : Russell's Ap., 75 Pa. 269; Rick's Ap., 105 Pa. 528; Cuthbertson's Ap., 97 Pa. 163.

This case is almost precisely similar in its facts to Rick's Ap., 105 Pa. 528, where Justice PAXSON says : " It is not too much to say in view of this that the idea of this trust-deed originated in the brain of the appellant, and the burden of proof is upon him."

A man may be competent to make a deed or will, but when the chief beneficiary draws it for him he must show that the grantor understood it: Cuthbertson's Ap., 97 Pa. 163.

Thomas v. Loose, and Kesler's Est., were mutual contracts for a valuable consideration ; they surely have no application to a voluntary deed made under undue influence.   In Phillips v. Mullings, 7 Ch. Ap. 244, the settlor's own solicitor prepared the deed.

This case ought to be ruled by Frederick's Ap., 52 Pa. 338 ; Rick's Ap., 105 Pa. 528; Green v. Rick, 121 Pa. 130.


OPINION BY Mr. JUSTICE DEAN, May 8, 1893 :

On May 12, 1887, Philip Reidy, the plaintiff, conveyed to his daughter, the defendant, in trust, all his real and personal estate in Philadelphia, consisting of three lots on Lombard street, also about seven hundred and fifty dollars ($750) in cash.   The trust was, that the trustee should manage the property and pay over to the grantor or settlor the net income, quarterly, during his natural life.   He reserved the power of testamentary disposition of the property.   The only possible personal benefit to the trustee was the right to the legal commissions.

The settlor owned some valuable real estate in New York city, for which he, at the same time, made a like conveyance to his trustee.   There was no right of revocation in either deed.

The trustee accepted the trust and performed its duties until the 24th of May, 1890, when the plaintiff filed this bill against her and Dr. Edward P. Small, her husband, averring :

1. That the trustee had taken advantage of his weak physical condition at the date of the deed, and fraudulently induced him to seal and deliver it.

2. That said Jennie A. Small had, while he was prostrated with sickness, and absent in Europe for his health, fraudulently appropriated to her own use the purchase money of real estate in New York, as well as personal property, title papers and other articles, which, on demand, she refused to surrender to him.

He therefore prayed that the deed be canceled, and that she be ordered to restore to him his personal effects.

The defendants denied every averment of fraud or imposition; admitted the execution of the deed; alleged that the trust was a proper one, and that the deed creating it ought not to be canceled.

On the issue thus framed Owen Wister, Esq., was appointed master. From the testimony, he finds there was no fraud or imposition practiced on plaintiff to procure the deed; that Dr. Small, except that he was the husband of Jennie A. Small, had nothing whatever to do with the matter; that plaintiff physically and mentally was able to take care of his person and to manage his own estate; that he had not the advice of independent counsel when he executed the deed, and did not comprehend sufficiently the scope of it. Therefore, he suggests that a decree be made for the cancellation of the deed, and the restoration to plaintiff of all the property which passed by it. The decree suggested by the master was adopted by the court, and from that decree this appeal is taken.

There is much testimony but few facts in the case. Reidy, the plaintiff, is a native of England, about seventy-three years of age. He came to this country in 1849. Within two or three years afterwards his wife came, and soon after his daughter Jennie, then about ten years old. The father was a printer and worked rather steadily at his trade, although he was somewhat addicted to the excessive use of liquor. Insanity was hereditary in his family, no less than four members of it having committed suicide while insane; he himself, soon after his arrival in this country, was for some time confined in a lunatic asylum; afterwards he was an inmate of University and Presbyterian Hospitals in Philadelphia for short periods, because he feared insanity, for he had frequent fits of mental depression bordering on insanity. In 1872, his daughter, this defendant, then thirty-one years of age, was married to Dr. Small, a rep-

utable physician, and went to housekeeping with her husband in Philadelphia.

In 1875 Mrs. Reidy, the wife and mother, died, and thereafter, at intervals, Reidy made his home with his daughter. He was a skilled workman, had always earned good wages, and, except as to money paid for liquor, was saving in his habits. His wife and daughter were industrious, thrifty, and ambitious. The result of their joint efforts was the accumulation of considerable property, mainly in improved real estate in Philadelphia and New York, all of which was put in Reidy's name.

Although industrious and saving, he was in no sense of the word a business man ; he hated details, distrusted his own judgment as to values, and was always afraid of being cheated. So that as soon as his daughter was able to comprehend his affairs, she was intrusted with the investment of his money, and had, by his express authority in writing, the oversight and management of his property. He was not at all a dull man, for, by reading and rather acute observation, he had become well informed. But the affectionate side of his character was scarcely perceptible. He had some crude notions of obligation to his wife and daughter, but showed very little tenderness towards either, and not the semblance of self-denial, to promote their comfort and welfare. He was a hard, selfish man. The wife and daughter tried to perform faithfully their duty towards the husband and father, as they understood it ; their great anxiety was to get on in the world. They were specially solicitous that he should not squander his liberal earnings for drink, and constantly feared that he would, as he sometimes did, disgrace them by drunkenness. This husband and father, it will be seen, was not a very lovable character, and he got in the way of return from his wife and daughter just about all he was entitled to, a formal observance of the duty which they thought they owed him because of their relation to him ; they were not designing as he thought, but simply dutiful.

A close scrutiny of all this testimony leaves no doubt on our minds, that what we have so briefly narrated is a correct statement of the attitude of these parties towards each other for the years immediately preceding the wife's death and the date of the deed in 1887. This deed conferred no benefit on the daughter ; she did not expect nor did the father intend any.

The question then is, what was the motive for the conveyance? So far as the evidence shows, Reidy, after his wife's death, except this daughter, had none but remote kindred, for whom he felt no sort of attachment. He had a few convivial friends, such as a man of his tastes and habits would have, but he does not seem to have cared specially for any of them. The one living being who stood somewhat close to him was this daughter. He had very little affection for her, but he had quite a high regard for her as a business woman, and had implicit confidence in her judgment and tact in the management of his property. Until nearly four years after the date of this deed, she seems to have been the only person he did not suspect of a desire to cheat him; for years before, all his business was intrusted to her. It is not only probable, but there is no reasonable doubt, that, in 1887, as matters then stood, whether he died testate or intestate, his property would go to her. Both from his testimony and hers they so understood and expected. But he had never been in good health; was a chronic dyspeptic, and at times, after an immoderate indulgence in drink, his nervous system was greatly disordered. The tendency to insanity, which he had inherited, was then perceptibly aggravated; he had distressing forebodings, and thought total insanity impending; distrusted himself, and was filled with suspicion of all around him; thought somebody would rob him, or influence him to make over his property. These fears were not wholly groundless, for, besides his fear of insanity, he was conscious of his love of drink, and that this at times impelled him to foolish acts with reference to his property. He abhorred poverty, and had a pride in the ownership of property which crops out all through his life. It is not strange, then, he was afraid that in some weak moment he might denude himself of his possessions. He determined to effectually prevent this by executing some paper or writing that would render it impossible.

This idea was not suggested by the daughter; it was the consciousness of his own physical and mental infirmities and the presence of his own fears that prompted it. He and the daughter consulted on the matter, and she concurred with him in the opinion that something ought to be done; Mr. Winship was consulted, and he, in view of the purpose to be accomplished, suggested the deed of trust. It does not matter whether

Reidy saw Mr. Winship; if the daughter alone saw him, it was at her father's instance and for his purpose, not hers. They had interviews, then, with three reputable lawyers, and the trust deeds were drawn and executed, always with the object originally suggested by him, the putting of his property in such a legal shape as would protect it from the cupidity of others and his own insane or foolish disposition of it. This act of his was wholly voluntary on his part, was strongly desired by him and fully understood. Nor was any advantage taken of him in drawing the deed; it accomplishes nothing except the end so earnestly sought after by himself. It reserves the entire income of all the property to himself, to be paid to him quarterly; he retains the power of appointment by will as to the corpus of the estate. Not a single benefit, except a meagre commission, passes to the trustee. The supervision of her management of the trust always rests with the proper court. She is answerable for neglect or incompetency; if she wastes or mismanages the estate she can be removed, or proper security can be exacted.

Every material fact averred in plaintiff's bill is found against him by the master. He finds as a fact: (1) Plaintiff desired some arrangement that should save him from likely or unlikely dangers. (2) There is no evidence of fraud. (3) None of conspiracy. (4) The trust is an active one. But he suggests that the deed be set aside, because there is no clause of revocation, and because Reidy did not understand the effect of such an omission.

True, there is no clause of revocation, nor was the absence of it explained, because it was the clearly defined purpose of Reidy to execute an irrevocable trust. It was not technically a spendthrift trust, for the settlor was in no danger of squandering his estate by the common spendthrift habits. We can well understand, why a clause of revocation should be put in the ordinary spendthrift and drunkard deed of trust. Reformation may wholly do away with the necessity for the trust, in which case the right of the settlor to the full enjoyment of his property would be unquestioned. But a trust created by an old man in a lucid interval, in terror of impending hereditary insanity, all the more probable because of vicious personal habits, from its very purpose should be irrevocable. A power of

revocation would defeat the object of the trust; such a settlor would periodically create and periodically revoke the trust, and the revocation would in all probability be for the accomplishment of the act which, in his wiser mood, he sought to guard against by the deed.   The true rule, as correctly stated by the master, is laid down in Toker v. Toker, 3 De G. J., & S. 487: " The absence of a power of revocation is a circumstance to be taken into account, and is of more or less weight according to the other circumstances in the case."   Where the deed confers a gratuity on the grantee, Cooke v. Lamotte, 15 Beav. 234 ; or a large benefit accrues to the trustee, Wollaston v. Tribe, L. R. 9 Eq. 44 ; or it appears that no provision was made for a serious contingency, such as the survivorship of the settlor, as in Russell's Ap., 75 Pa. 269; or where a revocable deed would have answered the purpose of the trust as well as an irrevocable one, Hall v. Hall, L. R. 14 Eq. 365, the absence of a power of revocation becomes important.   But the want of such a power in this deed, under the circumstances we have stated, needs no explanation.   An explanation would have been necessary if one had been inserted, for the obvious suggestion, then, in view of the purpose, would have been, why execute the trust at all, when with such power it is no protection against the very act to be guarded against.

We think the execution of this deed, under all the circumstances, was a wise act on part of plaintiff; both he and his trustee have access to the court, who will see to it that the trust is faithfully executed.   There is no reason shown why it should be revoked, while there are many why it should be sustained.

Therefore the decree of the court below is reversed and plaintiff's bill is dismissed, costs to be paid out of trust estate by Jennie A. Small, trustee.

MR. JUSTICE MITCHELL dissents.