## Palermo Estate

*Jerome E. Ornsteen*, for accountants.

*Bayard M. Graf, Thomas D. Wood* and *J. Willison Smith, Jr.*, for petitioner.

*Joseph C. Bruno*, p. p., trustee ad litem.

SHOYER, J., April 1, 1963.—This trust arises under the deed of trust dated October 8, 1960, a copy of which is hereto annexed, whereby Rosemary Lukosevicz Palermo, settlor, transferred her therein itemized assets to her trustees, in trust, to pay over the net income to the settlor during her life, and upon her death to transfer the trust estate to her executor. In Item Second the trustees are authorized to apply any portions of the principal "for her comfortable maintenance and support; for education requirements, illness, operations, or for any reason whatsoever which shall, to the trustees in their discretion, seem sufficient." In two separate paragraphs, the fifth and the

fifteenth, the trust agreement is expressly made irrevocable, and there is a full and complete spendthrift clause as to both income and principal in the fourth paragraph, reading as follows:

"FOURTH: The Settlor directs that neither the income from said Trust Estate hereby provided for nor the principal thereof shall be liable for her debts, present or future, and shall not be subject to the right on the part of any creditor to seize or reach the same under any writ or by any proceeding at law or in equity. And the Settlor shall not have any power to give, grant, sell, convey, mortgage, pledge or otherwise dispose of, encumber or anticipate the income or any installment thereof or any share in the principal thereof, it being her will that *no right of disposition of any such property shall vest in her until the same shall have been actually transferred or paid over to her.*

"The Trustees shall hold income or principal of said fund free from all claims, attachments, judgments, executions and liens of every nature, by creditors against the Settlor, and *the Settlor shall not have any power to* anticipate, charge or encumber the fund or any part thereof or the interest or income thereof, or *in any way defeat the intent of this Agreement as herein expressed, which is to make provision for the support, maintenance and personal comfort of the Settlor free from liens and claims of creditors.*" (Italics supplied.)

Rosemary Lukosevicz Palermo, now Sharkey, is living, and the trust continues for her benefit.

This, the "First and Final" account of the trust, was filed because of the desire of the settlor to terminate the trust. The accountants request that the entire balance of principal, real and personal, shown in the account, amounting to $131,862.81, and undistributed income of approximately $200 be awarded to the settlor.

Subsequent to the filing of the account the settlor presented a petition to terminate the trust and to recapture the entire trust res. The petition recites that the settlor-petitioner is 23 years of age and presently resides in Florida, with her husband, William F. Sharkey; that she created the trust under deed dated October 8, 1960; that in March of 1961, "subsequent to the termination of a very unhappy first marriage and after the creation of the aforesaid trust your petitioner married her present husband, William F. Sharkey"; that in August of 1961, petitioner and her husband moved "to the State of Florida, permanently and at that time intended to and did change their domicile to and became residents of the State of Florida, that the Florida climate is beneficial to her health and well being and she intends that to be her permanent residence; that she has executed a last will and testament as a resident of Florida and therein named the Miami Beach First National Bank of Miami Beach, Florida, as her executor; that her husband "is gainfully employed in the State of Florida and is assisting in defraying current living expenses"; that she approves the account filed by her trustees and requests its confirmation; that she is the sole party in interest under the Trust Agreement, she is sui juris, and she retains a "complete and general power of disposition over the entire remainder interest," that "the Trustees have consented to the termination of the trust and to the distribution thereof to her."

Attached to the petition to terminate is the agreement of the parties dated May   , 1962, wherein it is stated, inter alia:

"3. The parties hereto are all the parties in interest in the trust, being the Settlor, the Trustees, and the sole beneficiary thereunder.

"4. It is agreed by the parties hereto that the trust be terminated and that the principal held in trust to-

gether with any accumulated income be transferred free of trust to Rosemary Lukosevicz Palermo Sharkey, in kind or cash as presently constituted."

At a hearing specially fixed for May 16, 1962, at the request of counsel for the petitioner, counsel for the trustees appeared together with Floridian and local counsel for the petitioner, all joining in the request to the court to terminate the trust. No one appeared to defend the trust. Counsel for the trustees asserted "that there are no parties other than the settlor to protect in the matter. The trust agreement makes no provision for any other parties . . . Secondly, we feel that this settlor has a very limited life expectancy. She is a paraplegic as a result of trauma suffered in an accident at the age of seventeen . . ." In urging termination of the trust counsel cited Stafford Estate, 258 Pa. 595; Chase Trust, 7 D. & C. 2d 519; Bowers' Trust, 346 Pa. 85; and Restatement, Trusts §339.

No evidence was submitted in support of the averments of the petition. Counsel stated that "settlor . . . is incapable of appearing. She will not be able to appear because she is not in fact ambulatory."

In view of the circumstances recited above, the hearing was continued generally. Subsequently, pursuant to a petition filed on behalf of the settlor, the court, by decree dated June 8, 1962, appointed Joseph C. Bruno, Esq., trustee ad litem to represent unborn and unascertained persons in the proceeding.

Thereafter, pursuant to the convenience of the petitioner and her counsel, the court fixed December 5, 1962, for further hearing. Petitioner appeared in person with her counsel and witnesses.

Jerome E. Ornsteen, a member of the bar of this court since 1956, testified that at the request of other counsel he met the settlor for the first time in March or April 1960, at the Jefferson Hospital in Philadelphia, where she had been confined for eight months, after he

had been informed that in February of 1958 she had received a settlement of a damage case against the Pennsylvania Railroad as a result of an accident which occurred October 4, 1956, and that in May of 1960 she would attain her majority and she was seeking legal advice as to what she should do with the fund then held by the guardian of her estate during minority. Mr. Ornsteen further testified that she was then in a Stryker frame, unable to be moved but mechanically, for eight months, and with 24 hour a day nursing care; he testified that thereafter he was apprised of the fact that her estate approximated $165,000 of which $30,000 was invested in the purchase of a home for her in King of Prussia, Montgomery County, and that her parents and younger sister were living there, rent free; that her parents and her sister constantly pressured her, demanding money; and that the petitioner was then the wife of one Frank Palermo, who had been sentenced to a term in excess of two years for violation of a Federal statute, involving a fraud, and who was otherwise an undesirable spouse. He testified that the present trustees were also the guardians of her estate during her minority; and she attained her majority on May 4, 1960; that while her husband was in prison, the settlor obtained a divorce from him in Montgomery County, and after many conferences with petitioner over a period of months and after visiting her home and family, his recommendation was "to insulate her from what [he] felt was the avaricious nature of her closest relatives"; that Mr. Phipps of the Montgomery County bar represented the guardians of the petitioner during her minority and that he, Mr. Ornsteen, drew the deed of trust and acted as counsel for the trustees; that petitioner moved to Florida in August of 1961, and established a permanent home there after she sold her home in King of Prussia, and since her removal has

broken contact with her family and former husband; that he has not seen or corresponded with petitioner from July 1961 until the evening of December 4, 1962; that her physical appearance has improved and she appears to have complete mental clarity and cheerfulness about her marriage and her life in Florida. He further testified that he first met petitioner's husband, Mr. Sharkey, prior to petitioner's marriage to him, saw him frequently prior to their marriage in March 1961 and before their removal to Florida, and he approves of him and of their marriage; that petitioner is capable of managing her property, and that her circumstances have changed since the inception of the trust.

On cross examination Mr. Ornsteen admitted that when he drafted the deed of trust the petitioner was already divorced from her first husband; that the deed was drawn after she reached 21 years of age, and executed by her on October 8, 1960, and he at that time explained to the petitioner the meaning of an irrevocable trust. She was not yet acquainted with her second husband who then sold cemetery lots; that neither the petitioner nor her husband had ever been in business before but they now contemplate using her trust estate to go into either the motel, apartment or retail business together.

Mrs. Rosemary Sharkey, the petitioner, while seated in a wheelchair, testified she is living in Hollywood, Florida, with her husband; that since her automobile accident in 1956 she has been paralyzed from the waist down, because of the severance of her spinal cord, and quite frequently requires hospital, doctor and nursing care, which her husband does for her; he answers her needs during the day, in the afternoon, evening "or anytime, and he's the best qualified to do it"; that she bought a house in Hollywood, Florida, and intends living there permanently, and fully agrees with Mr.

Ornsteen's testimony; that although Mr. Ornsteen explained to her what irrevocability meant, she executed the deed because she wanted to prevent those around her from prevailing upon her for money and she would now like to free the fund from the trust so that she and her husband could go into a business; that her husband and his parents "give her a lot of love and attention."

She testified that Dr. Harry Pernesly, an internist, Dr. Castor, a plastic surgeon, and Dr. Fixell, an orthopedist, are presently her physicians, and that in June of 1962 Dr. Fixell removed "an intermegallary nail that was holding my left leg together . . ."

In cross examination she admitted that her deed of trust relieved her of her problems; that she does not know the extent of her medical bills except that "they are quite a bit" and have been paid out by her trustees; that she went to the eleventh grade in school, and prior to the accident she was employed by the telephone company and later as a secretary; that she has no other income except from her deed of trust; that her husband, who is now 26 years of age, was also married and divorced once prior to his marriage to petitioner, and he is now unemployed; that she is looking to her Florida attorney, Mr. Wood, to advise her as to what business she should go into; that except for her physical incapacity, which requires her husband's constant attention, he would not be unemployed; that she receives $450 a month from her trust fund and the trustees pay all her medical bills; that her trustees have never been requested to invest any portion of her trust in a business for her.

Thomas D. Wood, counsel for Mrs. Sharkey, and a member of the bar of the State of Florida, testified that he first met Mrs. Sharkey about September 1961, and then her husband, and obtained from her a history of her accident, family, marital life and the his-

tory and a copy of her deed of trust and her purchase of a home in Hollywood, Florida, and her desire to make that her permanent home; that he prepared a will for her, duly witnessed, which names a Florida trust company as her personal representative; that Mr. and Mrs. Sharkey are known in their community as a devoted couple; that Mr. Sharkey performs the duties of a nurse for his wife, spending much required time in dressing her wounds, bathing her, picking her up physically and "he also has to do innumerable personal hygienic situations with Mrs. Sharkey."

Although Mr. Sharkey, petitioner's husband, was in court, he did not testify. Mrs. Sharkey testified that his schooling did not extend beyond the eighth or ninth grade, that he had four years active military service and four years inactive, that he had never held any employment for more than one or two years, and had never operated any business.

Dr. Martin L. Beller, an orthopedic surgeon, called by petitioner, testified that the petitioner was under his care from April 7, 1961, until July 15, 1961; that she was paralyzed from the waist down as a result of a fracture and dislocation at the mid-back area from an accident in 1956; she suffered a complete paralysis and loss of sensation in both lower extremities, with no feeling or movement from the mid point of her trunk down to her toes, called paraplegia, with "two severe open sores or ulcers with bone infection, or osteomyelitis, of both buttocks, the sacrum, the coccyx, or tailbone area, and the prominence upon which you sit . . . and there were also pressure ulcers or sores of both heels . . . bone infection of her left thighbone, or femur, with a fracture in the mid portion of the left femur which . . . was infected and was draining—what we call osteomyelitis." The doctor further testified that she suffered no pain from these sores—"if she sits too long . . . the skin deprived of

its normal response when you sit or irritate something too long, this broke down." On her second hospitalization "she had a rip or laceration in her vagina as the result of the performance of the sexual act with her husband, but without the protection of feeling on her part in this area." The professional prognosis "is very poor", because of the recurrent infection in her skin, the kidney infection which accompanies almost all paraplegia, and is worse in women than men, usually resulting in death from uremic poisoning. Her condition is worse because of the "multiple areas of drainage from bone all over the lower half of [her] body, plus an old focus of infection in [her] femur" (N.T., p. 100). She "will need constant medical care . . . surgical and perhaps physical therapy"—incurring "quite substantial" medical bills for the rest of her life. It is extremely unusual for paraplegics to survive beyond 10 to 15 years, so that "statistically Mrs. Sharkey is at least one-half to one-third through her life expectancy.

### Findings of Fact

The testimony before me was uncontradicted. The evidence clearly establishes and I make the following findings of fact.

(1) Rosemary Lukosevicz Palermo, now Rosemary L. Sharkey, hereafter referred to as "Settlor", was born May 4, 1940, and is past twenty-two years of age.

(2) A collision between an automobile in which settlor was riding and a train on October 4, 1956, resulted in serious injuries to the settlor, inter alia, a severance of her spinal cord and fractures of both legs so that since that date she has been a paraplegic, without sensation from her waist down to the tip of her extremities, and with the drastically shortened life expectancy of all female paraplegics.

(3) The settlor's claims against the railroad company were settled and the sum of approximately

$165,000 was paid to Provident Tradesmens Bank and Trust Company and Walter E. Alessandroni, legal guardians of the estate of Rosemary L. Palermo, a minor.

(4) Shortly before attaining her majority the settlor commenced conversation with her attorney, Jerome E. Ornsteen, Esq., as to how she could best manage and preserve her estate after attaining her majority. These conversations continued between settlor and her attorney and finally culminated in the execution by the settlor on October 8, 1960, of her deed of trust whereby she irrevocably transferred to Provident Tradesmens Bank and Trust Company and Walter E. Alessandroni, trustees, all of the assets held by them as guardians of her estate during minority.

(5) The provisions of the deed, including the meaning of an irrevocable trust, were explained by counsel to settlor, and she understood the significance thereof before signing and sealing the trust instrument.

(6) Among the assets transferred to her trustees was premises 113 West Monroe Street, King of Prussia, Pa., at a value of somewhat less than $16,000, which premises were acquired by the guardians of the minor's estate as a home for her. The said premises were occupied by the minor, her father and mother and her two sisters.

(7) Settlor's husband, Frank Palermo, signed a marital waiver of his property rights while he was serving a two-year term in Federal prison for fraud, and settlor divorced him shortly before (or after) she executed the deed of trust.

(8) In March 1961, the settlor married William Sharkey and the marriage is still subsisting. The settlor is childless.

(9) On or about the middle of August 1961, settlor and her husband moved to Hollywood, Florida, where

they still reside together. As shown by the account, during the period December 20, 1961, to February 7, 1962, the trustees under the deed of trust invested the sum of $20,442 of trust corpus for the purchase and construction of a home for the settlor in Hollywood, Florida.

(10) As a result of the injuries suffered by the settlor, mentioned in (2) above, the settlor has been physically incapacitated. She has required hospitalization in the past and undoubtedly will in the future. She presently requires special medical services and 24-hour a day nursing care.

(11) The settlor's only source of income is from her aforementioned deed of trust wherefrom she currently receives $450 monthly and the trustees have paid and currently are paying out of the trust, principal and income, all medical expenses, which have been substantial.

(12) Settlor's husband, at settlor's request, performs all necessary nursing services for settlor and he is thereby rendered incapable of being gainfully employed.

(13) The settlor, upon the advice of her attorney in Florida, has sought to terminate the instant trust in order that the settlor's trust assets might become available for any prospective business enterprise that settlor may choose for the gainful employment of herself and her husband.

(14) Settlor has not heretofore made any request of her trustees to invest the trust assets in any business enterprise that might afford gainful employment to herself and her husband.

(15) The settlor transferred her assets under her deed of trust dated October 8, 1960, because she was then unable to manage her own property owing to her serious physical incapacity and her desire to conserve her assets for her support, maintenance, medical and

nursing expenses incident to her illness of interminable duration.

(16) No proof has been submitted to show that the settlor has been relieved of her incapacity or that she is able to manage her property. On the contrary, the incapacity of the settlor still persists and will continue to persist for an indeterminate period of time and she is still unable to manage her property.

(17) In agreeing to a termination of the trust the trustees have failed to exercise the discretion required in the second paragraph of the deed as a condition precedent to the exercise of their authority to disburse principal.

### Discussion of the Law and Conclusions

Petitioner's counsel insist upon termination as a matter of right, relying chiefly on the Restatement, Trusts §339, on Bowers' Trust Estate, 346 Pa. 85, and on Schellentrager v. Tradesmens Nat'l Bank and Trust Co., 370 Pa. 501. They fortify their argument by reference to paragraphs three and four of the "Termination Agreement" which recite that the only "parties in interest in the trust are the Settlor, the Trustees, and the sole beneficiary," all of whom have "agreed . . . that the trust be terminated."

Actions to revoke or rescind formal written agreements have always been within the province of equity jurisdiction. Of course, if petitioner can show a clear legal right to the requested termination, it would be difficult for anyone to assert or maintain valid objection to the relief sought. Courts exist to enforce the intent of parties to a written agreement which usually involves the remedy of performance or damages for breach. Rescission is comparatively rare, being allowed only for fraud, accident or mistake as a general rule. The auditing judge appointed a trustee ad litem to present counter arguments to the petition inasmuch as the trustees had abrogated their traditional respon-

sibility of defending the trust. Mr. Bruno, in fulfillment of his appointment, has extended his services as an amicus curiae and the auditing judge has accepted them as such.

That the trust agreement which petitioner seeks to terminate is not merely a very formal, one could as well say formidable, document, is apparent from even casual inspection. It is composed of 16 numbered paragraphs in 9 numbered pages, each page having been signed by settlor. Attached are three pages scheduling the assets and describing the real estate. Settlor and the trustees signed and sealed the agreement at the end thereof. In both the fifth and the fifteenth paragraphs the trust is expressly declared to be irrevocable, and in the fifth it is provided as follows:

"FIFTH: It is hereby declared by the Settlor that she has been fully advised as to the legal effect of the execution of this Agreement. . . . ; and further that she has given consideration to the question whether the settlement herein contained shall be revocable or irrevocable, and she hereby declares the same to be irrevocable and that it shall stand without power in her at any time to revoke, change or annul any of the provisions contained herein."

The settlor in her petition, and through her counsel in their brief and argument, demands the corpus as a matter of property right vested solely in her and requests the distribution of the corpus to herself. Petitioner's counsel cite Lyon v. Alexander, 304 Pa. 288 (1931), and Miller Estate, 27 D. & C. 2d 239 (1962), for the proposition that a life tenant with a general power of appointment over principal by will has, for most practical purposes, an estate tantamount to a fee, and no one can be wronged by what such life tenant may do with the trust property.

They cite the Restatement, Trusts 2d §339, entitled "Where settlor is sole beneficiary," which provides: "If

the settlor is the sole beneficiary of a trust and is not under an incapacity, he can compel the termination of the trust, although the purposes of the trust have not been accomplished."

It is pointed out on behalf of the settlor that in Bowers' Trust Estate, 346 Pa. 85 (1943), the Supreme Court adopted section 339 of the Restatement and terminated a sole and separate use, upon the petition of a settlor who was the sole party in interest, notwithstanding spendthrift provisions; that Bowers' Trust Estate, and the section of the Restatement was cited and followed by our Supreme Court in Schellentrager v. Tradesmens Nat'l Bank and Trust Company, 370 Pa. 501 (1952), and in an adjudication by President Judge Klein of this court in Chase Trust, 7 D. & C. 2d 519 (1956).

In resisting the termination of the trust, the trustee ad litem distinguishes Bowers' Trust from the instant matter. He points out that this settlor is but 22 years of age, already divorced and remarried, is an invalid and is dependent entirely upon her trust for her support; that her *incapacity* distinguishes the instant matter from Bowers' Trust. The auditing judge agrees that the facts here present are not analogous to the three cases cited by petitioner's counsel, and they were all decided upon principles not relevant to a determination of the present issue.

In Long v. Tradesmens National Bank and Trust Co., 108 Pa. Superior Ct. 363, 367 (1933), the court stated: "In order to be irrevocable a voluntary trust deed must contain in it some benefit or advantage to others" [citing cases] *"or be made to protect the settlor against his wasteful habits, intemperance, etc.*: Merriman v. Munson, 134 Pa. 114; Reidy v. Small, 154 Pa. 505; Stockton v. Ryan, 176 Pa. 71. . . ." (Italics supplied).

In Rehr v. Fidelity-Philadelphia Trust Co., 37 D. & C. 324, 327 (1940), Judge Bok, then a president judge of

the common pleas court, later Mr. Justice Bok, stated:

"The law now regards a settlor who trustees his own property for his own benefit with a spendthrift clause as a ward of the court".

In Neal v. Black, 177 Pa. 83 (1896), the court stated, page 98: "When a young man, soon after coming of age, makes a voluntary deed giving away his estate, or relinquishing a right in favor of another, and especially if he be of weak mind and inexperienced, the transaction should be carefully considered in view of all the circumstances." And at page 101: "At the first blush it would seem that one who was compos mentis and sui juris, who has made a voluntary deed for his own benefit, and by it granted no vested right to another, should have the power to control his own affairs and revoke the trust whenever he felt disposed to do so. This does not appear to be the law. When such a trust is created the party constitutes himself a ward of the court and cannot revoke his act except subject to the approval of a court having jurisdiction of such subjects."

In refusing to terminate the trust the court, in Neal v. Black, relied on Reidy v. Small, 154 Pa. 505, where the court said:

" 'We think the execution of this deed, under all circumstances, was a wise act on the part of the plaintiff. Both he and the trustees have access to the court who will see to it that the trust is faithfully executed. There is no reason why it should be revoked, while there are many why it should be sustained'. The facts of that case and the reasoning from them, as stated by Justice Dean, would aptly apply to this case by substituting 'natural incapacity' for 'drunkenness and fear of insanity.' "

Neal v. Black, supra, and Reidy v. Small, supra, are cited in a footnote to the opinion of the Supreme Court in Bowers' Trust Estate, supra, at page 88, as not being

in accord with the rule of the Restatement. However, these cases are not expressly overruled and, in Bowers, the opinion by the Supreme Court states, at page 90:

"A refusal by the court to terminate the trust, so far from carrying out any object she may originally have had in view, actually prevents her, during her entire lifetime, from utilizing her own property for her support in the face of a shrinking income which is insufficient to provide for her even the bare necessities of life. *Certainly the protection afforded her by a court of equity should be real, not ironical.*" (Italics supplied.)

In other words, termination is still a matter for the court's discretion, and if the protection of a court of equity is *necessary*, it is a proper exercise of the judicial function for the court to withhold its consent. Viewed in its proper perspective, therefore, the reversal of the lower court in Bowers is seen more as the correction of an abuse of discretion than as the recognition of an absolute property right in the settlor. In a sense the Bowers trust had run its course. The remainder had vested in the remainderman, who was not limited by the spendthrift clause, he had assigned his entire interest to the settlor, and she by her petition was asking termination as the *fulfillment* of the trust, not its *revocation.* The power and responsibility of this court to apply equitable principles is no less today than it was when, in deciding Neal v. Black, the court held, page 108: "As matter of law we find that the plaintiff has not the power arbitrarily to revoke a deed voluntarily made; that such revocation is subject to the judgment of the court, and should not be ratified unless it appear that the best interests of the plaintiff so require."

In like manner the spendthrift trust clause which in Bowers served no useful purpose, the shrinkage in the trust corpus having occurred there without any inroads by creditors or the settlor herself, cannot here be so

lightly cast aside because of Mrs. Sharkey's obvious incapacity.

It does not appear that the settlors in Bowers, Schellentrager or Chase were under any *incapacity* when those trusts were terminated by the court on settlors' petitions. However, it is interesting to note that in Chase the termination of the trust resulted in distribution of the corpus to one of the original trustees in further trust for the settlor under his contemporaneous deed of trust. Moreover, in Schellentrager, the Supreme Court through Mr., later Chief Justice Jones recognized the principle that "it is a court's duty, if reasonably possible, to construe written instruments so as to make them legally effective." Compare McKean Estate, 366 Pa. 192, and Shapley Trust, 353 Pa. 499, where the court went to great lengths to give full effect to the settlors' intentions in protection of their written deeds. By contrast, the present settlor on the advice of her Florida counsel has made no attempt to observe the limitations or live within the confines of her own written instrument.

There is no evidence here that the settlor's serious *incapacity* resulting from her accident has been removed, or that she is *capable* of managing her affairs, or that her assets have not been made available by her trustees to the full extent necessary to meet any of her needs. On the contrary, the account shows and the settlor testified she has adequate income from her trust estate and all the substantial hospital, medical and nursing expenses have been paid out of her trust estate, without any financial contribution thereto from her husband or from any other source.

The Restatement, Trusts 2d §339 expressly precludes a settlor under an "incapacity" from terminating his trust even if he is the *sole beneficiary thereof*. The reporter's note to the section states, "If the settlor is not under an incapacity at the time when he creates

the trust, but he subsequently becomes under an incapacity, he cannot thereafter terminate the trust. Thus, if the settlor becomes insane or is judicially declared a spendthrift, he cannot terminate the trust. . . ."

In Elliott Estate, 4 D. & C. 2d 462 (1955), the Orphans' Court of Elk County refused to terminate an inter vivos trust created by a settlor who was later adjudicated an incompetent and a guardian of his estate appointed.

When settlor created the present trust she was barely released from the incapacity of her minority and lacked the physical strength needed to protect herself from the importunities of her greedy family and unsavory husband. With noteworthy mental acuity she had prepared herself in advance by seeking legal advice while still a minor. Unquestionably the trust has accomplished some of her original purpose, because she has pulled free from the shackles and restraints of those whose interest in her was proven to be largely, if not solely, mercenary. The seriousness of her physical condition today is no less, however, and she remains dependent upon round-the-clock nursing services. Incidents of most intimate personal hygiene must be performed for her, for she is unable to do for herself. To eliminate wastes from her body she is confined to the use of a bedpan. She must be lifted on and off. The skin of her legs and feet is morbidly tender so that it is prone to break open and ulcer from the slightest bruise. While her wheelchair was being moved to a position near the witness stand she was apprehensive lest her feet and legs be bumped against the bar of the courtroom. Dr. Martin Beller's testimony was intentionally given while Mrs. Sharkey was out of the courtroom. His prognosis that uremic poisoning will ultimately end her life is very discouraging, but, supported by the medical explanation and statistics which he gave, is all too convincing. According to the doctor most of the paraplegic

soldiers who survived World War II are now dead as the direct result of the complications which inevitably attend this type of disability. It follows that Mrs. Sharkey has already exhausted one-half the curtailed life expectancy allowed her as a paraplegic in the opinion of this witness.

While incapacity in law is undoubtedly the opposite of sui juris, can anyone say that this young woman is not suffering under a grave incapacity? She knows not the number of days alloted her to spend outside the hospital. So much of her daily living is dependent on aid from others that she may even continue to exist. When one says that her thought processes are normal for a *paraplegic*, one can say no more. Her mind and body with the vitality of youth have carried her through a terrifying ordeal, but no less real and ominous are the tribulations ahead. That in the two brief years of her new marriage she has constantly been the beneficiary of the devoted ministrations of an ever present husband is insufficient guaranty that her needs will not continue well beyond the cessation of his attentions. He has established no record of endurance at any worthwhile engagement. Just suppose that he does harbor ulterior motives, that perchance he is quite a feckless fellow. What a tragedy then to remove this trust corpus from the safety of the trustees and expose it to his inexperienced hands. His failure to take the witness stand, although present in court, has aroused serious misgivings in the mind of the auditing judge.

Obviously this settlor could not now withstand the demands and importunities of unscrupulous relatives any more than she could in 1960. The strength of any mind is not determined solely by its power of reaching a decision, either with or without independent advice. Inextricably linked with the decision when arrived at is the ability to hold it fast and to carry it out. Inordinate physical weakness, or almost total physical dis-

ability such as here present, limits the determined execution of all important decisions and many minor ones. Add to that incapacity the round-the-clock presence of self-centered or avaricious relatives and the picture becomes the equivalent of weak-mindedness, or inherent and uncontrollable prodigality.

It is the firm conclusion of the auditing judge that the instant settlor, because of her permanent physical incapacity, is unquestionably a ward of this court, and in no lesser degree than was the settlor in Neal v. Black, supra, Merriman v. Munson, supra, Reidy v. Small, supra, and in Elliott Estate, supra. This settlor is totally incapable of *managing* her own affairs. The broad discretionary powers which she, by her deed of trust, has vested in her trustees does not warrant a termination of the trust under the present circumstances. Accordingly, in view of the foregoing, the application to terminate the trust was by decree dated even date herewith dismissed. . .

And now, April 1, 1963, the account is confirmed nisi.

### Supplemental Adjudication

*Jerome E. Ornsteen*, for accountants.

*Bayard M. Graf*, for settlor.

*Joseph C. Bruno*, p. p. trustee ad litem.

SHOYER, J., May 4, 1964.—This matter was referred back to me by the court en banc for further consideration. At the request of Mr. Graf, representing the settlor, the matter was set down for rehearing. At that time Mr. Ornsteen, on behalf of the trustees, advised the court that the fiduciaries had given consideration to revoking their agreement to terminate the trust entered into on "May , 1962," but inasmuch as counsel could not advise them of any legal grounds that would sustain such revocation, or, indeed, such grounds as would indicate that they had been in error in the

first instance in consenting to the termination, they, the trustees, felt obliged to stand firm on the position they had taken. "Morally, [they] believe that the trust should be continued," because it does put some limitation on the amount of Mrs. Sharkey's expenditures, which appear at times to be extravagant.

There has been no suggestion or request by the settlor for the withdrawal of any lump sum to invest in any prospective business. To the auditing judge this demonstrates the ephemeral, will-o'-the-wisp nature of the statements by settlor and her Florida counsel in support of termination. What substance can there be to their assertion that the principal purpose for seeking revocation of the trust was to permit Mr. and Mrs. Sharkey to invest a large portion of the trust funds in some suitable business to which they could both apply themselves? The record is bare of credible proof.

No additional evidence as to Mrs. Sharkey's present physical condition was produced, so the auditing judge is warranted in reaffirming the findings of fact in his adjudication. He also reaffirms his conclusions of law.

And now, May 4, 1964, the adjudication dated April 1, 1963, is approved, and the account is reconfirmed nisi.